PRESS, INC. d/b/a the Johnson City Press Chronicle, et al., Petitioners,

v.

Sherry L. VERRAN, Respondent.

Supreme Court of Tennessee.

July 31, 1978.

C. T. Herndon, III, Herndon, Coleman, Brading & McKee, J. Frank Bryant, Johnson City, for petitioners.

Richard W. Pectol, Johnson City, for respondent.

## OPINION

HENRY, Chief Justice.

We granted certiorari in this action of libel to consider the extent of a publisher's

constitutional privilege against liability for defamation. We focus on the specific issue of whether plaintiff is a "public official" or a "public figure" under the law of libel as it has developed under recent decisions of the Supreme Court of the United States.[1]

The trial judge sustained the motion of petitioner for summary judgment, holding that respondent, a junior social worker in the Washington County office of the State Department of Human Services, was a public official and a public figure within the meaning of the libel laws and that there was no proof of actual malice, nor any "indication of any reckless disregard for the truth or falsity of the matters printed." The Court of Appeals reversed, holding that plaintiff was neither a public official nor a public figure and only a negligence test applied against the publisher.[2]

We granted the writ in order to analyze the status of the plaintiff. We conclude that the Court of Appeals reached an erroneous conclusion and, accordingly, reverse.

## I.

The defendants to this action are Press, Inc., the publisher of the Johnson City *Press Chronicle,* a daily newspaper, one of its stockholders (presumably the chief executive or manager), and two of its bureau chiefs.

This action grew out of a series of ten articles appearing in the *Chronicle,* at periodic intervals from July 2, 1975, through September 3, 1975, all relating to the actions and activities of plaintiff in connection with the performance of her official duties. None related to her conduct as a private citizen.

On April 1, 1975, plaintiff received a telephone call from a school principal suggesting that some of the ten children of Elmer and Mary Tolley were the victims of child abuse. Pursuant to § 37–1206, T.C.A., plaintiff conducted an investigation during the course of which she visited the Tolley

residence in a remote rural section, interviewed Mrs. Tolley, observed the children and arranged for them to be examined by a medical doctor.

The medical examination indicated signs of abuse and plaintiff recommended to her supervisor that the children be placed in foster homes pursuant to § 37–1201, et seq., T.C.A. After approval by her supervisor and the legal staff of the Department, she completed the proper documents for submission to the Juvenile Judge, who ordered the children placed in foster homes. Plaintiff accompanied law enforcement officials to the Tolley residence and aided in the removal of the children. Soon thereafter, she met in her office with the Tolleys, who came in an effort to determine how they could get their children back.

According to the newspaper publications, among the requirements for the return of the children was that Mrs. Tolley submit to a bilateral tubal ligation. This condition was reported by the Tolleys to the *Chronicle,* which, after investigating the matter, ran the series of articles featuring the charge that Mrs. Tolley was "coerced into submitting to sterilization" in order to procure the return of her children.

When the *Chronicle* declined to make a retraction, this suit was filed.

It should be reiterated that while other issues are framed by the pleadings the only question presented to us for determination is whether plaintiff is a "public official" or "public figure." Nothing in this opinion is to be construed as holding that the complaint states a cause of action, or as resolving any other issue.

## II.

An analysis of the issues involved in this controversy must start with the landmark case of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), wherein the Supreme Court, considering the

---

**1.** The status of the libelled party is the only issue raised by the assignments of error.

**2.** Our recent case of *Memphis Publishing Co. v. Nichols,* Tenn., 569 S.W.2d 412 (1978), disposes of the question of the correct standard. This issue is not before the Court in this case.

case "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open," fashioned a new rule of "constitutional privilege":

> The constitutional guarantees require, we think, a federal rule that prohibits a *public official* from recovering damages for a defamatory falsehood relating to his *official conduct* unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not. (Emphasis supplied). 376 U.S. at 279–280, 84 S.Ct. at 726, 11 L.Ed.2d at 706.

The Court bottoms this rule upon the First Amendment guarantee of freedom of speech and of the press, made applicable to the states by the Fourteenth Amendment. While the Court applied the new rule to defamatory publications involving the "official conduct" of a "public official," it did not define the term "public official" nor determine how far down into the lower ranks of government employees the "public official" designation would extend, nor did it determine the boundaries of the "official conduct" concept.

Two years later, however, in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Court undertook a definition of the term "public official":

> [T]he "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs. 383 U.S. at 85, 86 S.Ct. at 676, 15 L.Ed.2d at 605.

In 1967, the case of *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, came before the Supreme Court. When the various opinions by the Court are analyzed, it becomes evident that the constitutional privilege was extended to "public figures" along with "public officials." The plurality opinion suggests that á public figure is one who

may have attained that status by position alone . . . [or] by his purposeful activity amounting to a thrusting of his personality into the "vortex" of an important public controversy, but . . . commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able "to expose through discussion the falsehood and fallacies" of the defamatory statements. 388 U.S. at 155, 87 S.Ct. at 1991, 18 L.Ed.2d at 1111.

Here, the volition of the injured was a critical consideration.

In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), "[t]he Court was sadly fractionated," [3] and could not agree on an opinion. Justice Brennan wrote for a plurality of three. In effect the plurality held that the status of the individual was not the controlling consideration; instead the test was whether there was involved an issue of "public or general interest." 403 U.S. at 44, 91 S.Ct. at 1820, 29 L.Ed.2d at 312. The effect of this holding was to extend the *New York Times* "knowledge—or—reckless disregard" rule to any issue of public interest. The Court said:

> If a matter is a subject of *public or general* interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety. (Emphasis supplied.) 403 U.S. at 43, 91 S.Ct. at 1819, 29 L.Ed.2d at 311.

Thus, the Court abandoned the status of the individual test. The fragile foundation of *Rosenbloom* endured for only three years.

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the

---

3. *Gertz v. Robert Welch, Inc., infra,* 418 U.S. at 354, 94 S.Ct. at 3014, 41 L.Ed.2d at 813.

Supreme Court retreated from the plurality position of *Rosenbloom* and declined to extend the New York Times privilege to defamation of private individuals, even though a matter of public interest was involved. The Court's rationale is evident from this quotation from the opinion:

Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

\* \* \* \* \* \*

Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. 418 U.S. at 344–345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808.

After pointing out that the media may assume that public officials and public figures have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood," the Court further amplified the theme of the protection of private individuals thusly:

No such assumption is justified with respect to a private individual. He has not accepted public office or assumed an "influential role in ordering society." (Citation omitted). He has relinquished no part of his interest in the protection of his own good name, and consequently he

has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery. 418 U.S. at 345, 94 S.Ct. at 3010, 41 L.Ed.2d at 808.

The Court declared that "the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." 418 U.S. at 343, 94 S.Ct. at 3008–3009, 41 L.Ed.2d at 807. Following this rationale, the Court specifically authorized the states to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood" but only "so long as they do not impose liability without fault." 418 U.S. at 347, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. Our recent case of *Memphis Publishing Company v. Nichols*, Tenn., 569 S.W.2d 412 (Tenn.1978), quotes and follows this authorization. *Memphis Publishing Company* establishes standards for suits by private individuals and has no application to those involving public officers or public figures, acting in their official capacities.

With respect to the term "public figure", the Court in *Gertz*, gives substantial guidance:

In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is *drawn into* a particular public controversy and thereby becomes a public figure for a *limited range of issues.* In either case such persons assume special prominence in the resolution of public questions. (Emphasis supplied.)

\* \* \* \* \* \*

Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful

context by *looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.* (Emphasis supplied.) 418 U.S. at 351–352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

The Court, however, provided no significant guidance on the meaning of "public controversy."

The major effect of *Gertz* was to provide greater protection for the reputational interests of private individuals.

This trend was followed and the meaning of the term "public figure" was further amplified in *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), and, in so doing, the Court instructed us as to what is not a public controversy.

There the underlying controversy was a divorce action between Russell Firestone, "the scion of one of America's wealthier industrial families," and his wife, Mary Alice Firestone, a case referred to by the Florida Supreme Court as a *cause célèbre.*[4] An ambiguous divorce decree was entered and *Time Magazine* reported that the divorce was awarded to the husband on the basis of the wife's extreme cruelty and adultery.

Time contended before the Supreme Court that the divorce action was a "public controversy" and that Mrs. Firestone should be treated as a "public figure." Responding to this, the Court said:

[P]etitioner seeks to equate "public controversy" with all controversies of interest to the public. Were we to accept this reasoning, we would reinstate the doctrine advanced by the plurality opinion in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), which concluded that the New York Times privilege should be extended to falsehoods defamatory of private persons whenever the statements concern matters of general or public interest. In *Gertz,* however, the Court repudiated this position, stating that "extension of the New York Times best proposed by the *Rosenbloom* plurality would abridge [a] legitimate state interest to a degree that we find unacceptable." (Citation omitted.) 424 U.S. at 454, 96 S.Ct. at 965, 47 L.Ed.2d at 163.

The Court held that Mrs. Firestone (a) "did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society"; (b) "did not thrust herself to the forefront of any particular public controversy"; and (c) "assumed no 'special prominence' in the resolution of public questions." Therefore, the Court said she "was not a 'public figure' for the purpose of determining the constitutional protection afforded petitioner's report of the factual and legal basis for her divorce." Further, the Court said that a divorce proceeding "is not the sort of 'public controversy' referred to in *Gertz,* even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public." 424 U.S. at 453–455, 96 S.Ct. 965–966, 47 L.Ed.2d at 162–163.

Clearly, in *Firestone* the Court bases its action on the nature and extent of the controversy as opposed to the status of the injured party. *Firestone* makes it clear that an injured party will not be classified as a "public figure" solely because he or she is deemed newsworthy by the media.

As will be seen from the foregoing analysis, the Supreme Court of the United States has constitutionalized the law of libel and, in material particulars, has preempted state statutory and decisional law in cases and controversies involving the communications media.

There may be no liability without fault, but the more highly placed the individual,

---

4. Mrs. Firestone was "prominent among the '400' of Palm Beach society, and an active [member] of the sporting set, . . . whose activities predictably attracted the attention of a sizable portion of the public." She subscribed to a clipping service and held news conferences during the course of the 17-month trial. The trial drew national coverage and "elicited no fewer than 43 articles in the Miami Herald and 45 articles in the Palm Beach Post and Palm Beach Times." 424 U.S. at 485, 96 S.Ct. at 980, 47 L.Ed.2d at 180–181.

the greater is the required degree of fault. The escalating range is from the private individual engaged in private pursuits, whose cause of action is to be tested by conventional negligence standards, up to public officials engaged in public duties, where the "knowledge—or—reckless disregard" rule indicative of actual malice is the constitutional criterion.

■ Under the *New York Times—Rosenblatt-Butts* line of cases a public official or a public figure may not recover in a defamation action from a media defendant in the absence of proof of "actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The *New York Times* rule is restricted to "official conduct"; however, subsequent cases indicate that involvement in public issues and controversies of interest to the public may be sufficient to trigger the constitutional privilege.

■ While the term "public official" has not been defined with precision, it causes us no particular concern. Generally the title and nature of the office will provide the answer. However, we find nothing magical, mysterious or mystical in the terminology. The occupant of any position in any branch of government who exercises any public function is subject to the *New York Times* rule as to all conduct in his official capacity or as to any conduct that might adversely affect his fitness for public office, if he has or "appear[s] to the public to have, substantial responsibilities for or control over the conduct of governmental affairs." *Rosenblatt, supra.*

■ This does not necessarily apply only to high public position. Any position of employment that carries with it duties and responsibilities affecting the lives, liberty, money or property of a citizen or that may enhance or disrupt his enjoyment of life, his peace and tranquility, or that of his family, is a public office within the meaning of the constitutional privilege.

■ The term "public figure" has been defined variously by the courts as reference to the above cases will indicate. Included within this classification must be those who have thrust themselves into the vortex of important public controversies; those who achieve such pervasive fame or notoriety that they become public figures for all purposes, and in all contexts; those who voluntarily inject themselves, or are drawn into public controversies, and become public figures for a limited range of issues; and those who assume special prominence in the resolution of public questions. There, no doubt, are other involvements that would invoke the "public figures" designation.

■ Finally, we think that a critical concern must be the nature and extent of the individual's participation in the particular controversy. See *Gertz, supra.* The status of the individual and the nature and extent of his involvement must be considered in those cases wherein the defamed party is involved in an activity affecting the public, but may not precisely fit into the pattern of a public official or public figure. It is a fact of life that one may be a public official today, a public figure tomorrow and a nonentity the next. His status must, in the last analysis, be dependent not only upon title or some convenient nomenclature, but also upon the character, nature, purpose, intent and extent of his participation in the particular controversy.

### III.

■ While the law of libel has now been federalized, or at least constitutionalized in substantial part under the federal constitution, we consider the provisions of Tennessee's constitution to be both relevant and significant. Section 19, Article I reads, in pertinent part:

> That the printing presses shall be free to every person to examine the proceedings of the Legislature; or of any branch or officer of the government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

To the extent of this controversy this is a substantially stronger provision than that contained in the First Amendment to the Federal Constitution ("Congress shall make no law . . . abridging the freedom . . . of the press") in that it is clear and certain, leaving nothing to conjecture and requiring no interpretation, construction or clarification.

This mandate of Tennessee's Constitution requires that any infringement upon the "free communication of thoughts" and any stumbling block to the complete freedom of the press "to examine [and publish] the proceedings . . . of any branch or officer of the government" is regarded as constitutionally suspect, and at the very threshold there is a presumption against the validity of any such impediment.

But it does not constitutionalize false and malicious defamations, and publishers are answerable for abuse. We equate "abuse of that liberty," as used in our constitution, with the phrase "actual malice" as used in *New York Times.*

### IV.

■ We are impressed with Standards 580A and 580B, Restatement (Second) of Torts (1977). They read as follows:

§ 580A. *Defamation of Public Official or Public Figure.* One who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other person, or

(b) acts in reckless disregard of these matters.

§ 580B. *Defamation of Private Person.* One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other,

(b) acts in reckless disregard of these matters, or

(c) acts negligently in failing to ascertain them.

We believe that these standards meet the criteria of our federal and state constitutions and we adopt them as the law of this jurisdiction.

■ In adopting these standards, we look to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open." We are guided by our belief that the news media have not only a right but a duty to make searching inquiry into all phases of official conduct and to realistically evaluate and assess the performance of duty by public officials.

Only under the most compelling circumstances should the courts place obstacles in the way of the news media, or muzzle or deter their investigative efforts and reporting, even though the end result may be distasteful, despicable and shorn of all sense of fairness. The right of the news media to criticize official conduct is limited solely to their answerability for actual malice, which means that the publication was made with knowledge of its falsity or with reckless disregard for the truth.

Any other standard would have a chilling effect upon one of the most cherished of all the freedoms specified in our bill of rights.

From the days of the lonely pamphleteer operating clandestinely in Colonial America and crying out against the usurpations of the Crown, we have elected to reap the benefits and bear the burdens of a free and courageous press. It may disturb our tranquility; if may vex our peace of mind; it may outrage our sensibilities; it may shock our conscience; and it may even momentarily shake our beliefs in the right of freedom of the press; but so deeply grounded is our national commitment to a free press that we as a nation tolerate its abuses. The *quid pro quo* is that we profit by the very freedom that sometimes causes us to squirm.

It has been said that the fire siren in the nighttime disturbs our slumbers, but it also keeps us from burning up in our beds. So long as we have a free press to focus on false prophets and to expose chicanery and skullduggery within our government, official misconduct will not go undetected or uncorrected. As Mr. Justice Brandeis observed, "sunlight is the most powerful of all disinfectants." See Freund, *The Supreme Court of the United States* 61 (1949). "A responsible press has always been regarded as the handmaiden of effective judicial administration . . . ." *Sheppard v. Maxwell*, 384 U.S. 333, 350, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600, 613 (1966).

## V.

■ In the instant case the trial judge determined that the respondent was a "public figure or official in at least a limited sense." He based his conclusion upon the following finding of fact:

The evidence available to this Court in considering this motion indicates that in this entire matter, beginning with the telephone call from a school official reporting to plaintiff, as a representative of the Tennessee Department of Human Services, a possible case of child abuse; her going to the home of Mr. and Mrs. Tolley to investigate this allegation pursuant to her duty under our code; her taking the children for examination by a physician; her making her own and the physician's recommendation to her supervisor that legal action be taken in the Juvenile Court; her accompanying the officers to take the children from the Tolley home pursuant to the court order; her making herself available to the Tolleys to discuss requirements for return of the children; and in any and all other matters connected with this case, the plaintiff acted in her capacity as a Junior Social Worker employed by a unit of the state government, not in her individual capacity as a private citizen.

We concur in his findings and conclusions. It is true that as a public official she ranks rather low in the hierarchy of state government; however, we do not perceive that the "pecking order" is pertinent. To the Tolleys she had sufficient power to remove or cause their children to be taken from their custody and placed in a foster home, and to lay down conditions fraught with financial, physical and psychological problems. While this action may have been proper in all respects, its employment was unquestionably heady.

To the Tolleys she was the very epitome of government.

## VI.

The only issue before us for determination is whether respondent was a public official or public figure. We have made that determination. In the present posture of the lawsuit, we can only reverse the Court of Appeals and affirm so much of the judgment of the trial judge as found respondent to be a public official, within the meaning of the constitutional privilege.

In the interest of the administration of justice, we direct that the trial judge, on remand, address the significant issue raised by the pleadings, (but not by motion for summary judgment and, therefore not at issue in this appeal), i. e., is the publication defamatory or libelous? A negative response to the question concludes the controversy.

Assuming, but by no means suggesting, an affirmative response, the trial court would proceed to try the sole remaining issues of (a) the truth of the publication and (b) if untrue, whether it was made with actual malice as defined in *New York Times v. Sullivan, supra.*

The judgment of the Court of Appeals is reversed; that of the trial judge affirmed; and the cause is remanded for further proceedings not inconsistent with this opinion.

FONES, COOPER and HARBISON, JJ., and OLIVER, Special Justice, concur.