**Clifford FERGUSON, Plaintiff–Appellee,**

v.

**The UNION CITY DAILY MESSENGER, INC., and David Bartholomew, Defendants–Appellants.**

Supreme Court of Tennessee, at Jackson.

Nov. 30, 1992.

James M. Glasgow, Elam, Glasgow & Acree, Union City, Charles W. Burson, Atty. Gen. and Reporter, John Knox Walkup, Sol. Gen., Michael W. Catalano, Deputy Atty. Gen., Nashville, for defendants-appellants.

Ted M. Hayden, Less & Scroggs, Memphis, for plaintiff-appellee.

OPINION

REID, Chief Justice.

This case presents appeals by all parties from the judgment of the Court of Appeals in an action by Clifford Ferguson, a former employee of Obion County, against the Union City Daily Messenger and its editor, David Bartholomew, for defamation, interference with employment, and other charges, in which the trial court granted the defendants' motion for summary judgment on all charges. Ferguson appeals from the decision affirming summary judgment for the defendants on the interference with employment charge, and the defendants appeal the reversal of summary judgment for the defendants on the defamation charge. The record supports the trial court's summary judgment on both charges.

Ferguson was employed by Obion County from 1978 until 1987, during which time he had three different titles, although his duties remained essentially the same throughout his employment. His original title was Director of Accounts and Budgets, and he reported to the County Judge. (The chief executive officer of the County in 1978 was the County Judge. The name of the position later was changed by statute to County Executive.) In 1979, Ferguson's title was changed to Finance Director, and he was responsible to a committee of the County Commission. As Finance Director he employed Vickie Brown Graham as his secretary. In 1983, as the result of litigation initiated by the County

Board of Education, the Finance Department was abolished, and he was given the title Purchasing Agent and directed to report again to the County Executive. After Graham's employment with the County ended in 1984, Treva Bond was hired in her position. However, Ferguson described Bond as a "co-employee" rather than his secretary. They worked in the same office.

Ferguson's job description as Purchasing Agent, his title when the news articles were published, was as follows:

The Purchasing Agent is the buyer for the County, obtaining the proper equipment, materials, supplies and services needed by the County departments. The Purchasing Agent will prepare solicitations, obtain quotations, conduct competitive bids for purchases and evaluate responses, awarding contracts to those bidders that meet the specifications and are in the best interest of the County. He will also issue and sign purchase orders, sign warrants for the County and the Highway Department, attend meetings, on occasion, that will better communications with the public and that are in the best interest of the public. He will also keep inventory of County property, talk continuously with the citizens of Obion County about the well being of this County and will serve as County Director of TOSHA (Safety) for the County.

The record does not include evidence with regard to each specific duty set forth in the job description but, the proof shows that Ferguson was responsible for obtaining bids for goods and services purchased by the County, choosing the bids to be accepted, placing purchase orders, approving payment after receipt of the goods and services, and co-signing warrants issued by the County in payment of its obligations. Ferguson's responsibility also included presenting bids at open sessions of the Budget Committee or the County Commission before they were sent to prospective suppliers. He admits that he was responsible for all aspects of purchasing goods and services on behalf of the County except the preparation of the warrants for payment.

Payments for goods and services purchased by the County were made by warrants signed by Ferguson and the County Executive. Ferguson testified that Bond was responsible for the preparation of the warrants and for mailing out the signed warrants. The County Executive testified that it was Ferguson's responsibility to see that the County's bills were paid.

The news reports claimed by Ferguson to be defamatory related to the failure of the County to pay its bills when due. While Bond was on maternity leave in 1985, Ferguson reported to the County Executive that he had found unpaid bills in her desk and complained that Bond was not doing her work. In January, 1987, Ferguson produced unpaid bills which had been due in 1986. The County incurred more than $250 in penalty fees on utility bills because of late payments. Ferguson talked to vendors about unpaid bills, he publicly stated that vendors would not lose County business for complaining about unpaid bills, and he publicly requested vendors to contact him if they were having a problem getting paid. In 1987, the State suspended the County's credit with State agencies because obligations due the State had not been paid. The news articles lay the primary responsibility for the unpaid bills at Ferguson's feet.

Pursuant to the recommendation of a committee of the County Commission, appointed to investigate the purchasing of and payment for goods and services on behalf of the County, the position occupied by Ferguson was abolished and his employment terminated in June, 1987.

Plaintiff asserts that he lost his employment as a result of the news articles alleged to be defamatory. In response to discovery, Ferguson listed several dozen quotes from the newspaper articles which he contends were defamatory. He then stated in summary as follows:

All of the items mentioned in this response, as well as the entirety of the articles at issue, are slanted to convey an impression that the Plaintiff was responsible for all of the financial problems of the County with regard to paying its

bills, when the Defendants knew, or should have known, that the above statements were untrue, and that the Plaintiff was not responsible for the problems, and, in fact, had done all he was empowered and authorized to do to remedy the problems.

The statements alleged to be untrue did not involve any illegal or immoral conduct, but related to Ferguson's authority and the organizational relationship between him, Bond, and the County Executive. The substance of Ferguson's position is that Bond, not he, was responsible for preparing County warrants. Ferguson assigns as a major discrepancy in the newspaper reporting that he was "the man who writes the checks to keep Obion County going." He contends that even though he was required to co-sign the warrants, Bond was responsible for actually preparing the warrants, and, therefore, the statement was not accurate and was therefore defamatory. References in the news articles to another aspect of this relationship between Ferguson, Bond, and the County Executive are claimed by Ferguson to be inaccurate, and, therefore, defamatory. Those statements were that Ferguson was Director of the Department of Finance and Purchasing and that Bond was his secretary. The inaccuracy claimed is that at that time his title was County Purchasing Agent, not Director of Finance and Purchasing, and that Bond was a "co-employee," not his secretary. Ferguson stated in his deposition that he did not know if Bond was his secretary; however, he adamantly insists that though Bond "functioned as a secretary," he "never, at any time, admitted" that she was "his secretary." Along the same line, Ferguson insists that his quoted reference to "his office" meant "four walls and a door," not an official responsibility.

The record discloses the inescapable conclusion that Ferguson did not work cooperatively with Bond, even though they worked in the same office. The County Executive testified that Ferguson opposed Bond's employment because she was black. Ferguson said he opposed her employment because "there were other people he thought were better qualified."

In response to the County Executive's testimony that it was Ferguson's responsibility to see that the bills were paid because he was in charge of the Department, Ferguson insists that "the record fails to show that Mr. Ferguson was ever advised that he had any supervisory authority over Mrs. Bond," and "[m]oreover, there is no proof in the record that the defendants were ever told this by [the County Executive] or that they relied on his statement when attributing blame to Mr. Ferguson for failing to insure that the County's bills were paid timely."

Ferguson asserts that reference in the articles to him as Purchasing Agent, Director of Finance, Director of Finance and Purchasing, and Director of Finance and Budgeting is evidence of a reckless disregard of the truth and constitutes malice. Ferguson insists that the editor's stated belief that Ferguson was responsible for "seeing that the bills were paid" based on the "fact that he authorized payment and signed the checks" did not indicate lack of malice because Bartholomew "never asked County Executive Jarvis or Treva Bond whether they too had the authority to authorize payment." He asserts as further evidence of malice the newspaper's selection of news items. He states that the newspaper's view that "millions of dollars of taxpayers' money was being more properly and efficiently spent than in the past" was "not as newsworthy" as the failure of the County to pay its bills on time and that, on a particular date, an article regarding the County's financial problems was given more space than the allegation that another County employee "had embezzled thousands of dollars" show that the newspaper acted maliciously.

The trial court found that the plaintiff was a public official and that there was no material evidence to support a finding of malice and granted the defendants' motion for summary judgment.

The Court of Appeals affirmed the trial court's summary judgment on all counts except the charge of defamation. The

Court of Appeals, upon reviewing the evidence, found there was a

dispute as to whether Ferguson was responsible for seeing that the bills of Obion County were paid. Therefore, there is a genuine issue of fact regarding the scope of Ferguson's responsibilities as Purchasing Agent, which is determinative of his status as a public official under *Press, Inc.* [*v. Verran*, 569 S.W.2d 435 (Tenn.1978)].

That court did not address the trial court's decision that there was insufficient evidence to support a finding of malice.

The defendants assert that the Court of Appeals erred in reversing the trial court's award of summary judgment. Their contention is that publication of the news articles and editorials are protected by the First Amendment to the United States Constitution and Article I, Section 19 of the Tennessee Constitution. The First Amendment states in pertinent part:

Congress shall make no law ... abridging the freedom of speech, or of the press....

In *New York Times Co. v. Sullivan* the United States Supreme Court stated:

The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964). *See also, Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 658–59, 109 S.Ct. 2678, 2681, 105 L.Ed.2d 562 (1989).

Article I, Section 19 provides in pertinent part:

That the printing presses shall be free to every person to examine the proceedings of the Legislature; or of any branch or officer of the government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions, is one of the in-

valuable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

The right to publish granted by Article I, Section 19 is subject only to "being responsible for the abuse of that liberty."

In *Press, Inc. v. Verran*, the defendants relied upon both the state and federal constitutions for protection in an action for defamation based on certain newspaper articles. In comparing the protection afforded under the state and federal constitutions, this Court stated with reference to Article I, Section 19:

To the extent of this controversy this is a substantially stronger provision than that contained in the First Amendment to the Federal Constitution ("Congress shall make no law ... abridging the freedom ... of the press") in that it is clear and certain, leaving nothing to conjecture and requiring no interpretation, construction or clarification.

*Press, Inc. v. Verran*, 569 S.W.2d at 442. That difference in protection afforded, to the extent it may exist, is not material in this case. The Court stated further:

This mandate of Tennessee's Constitution requires that any infringement upon the "free communication of thoughts" and any stumbling block to the complete freedom of the press "to examine [and publish] the proceedings ... of any branch or officer of the government" is regarded as constitutionally suspect, and at the very threshold there is a presumption against the validity of any such impediment.

But it does not constitutionalize false and malicious defamations, and publishers are answerable for abuse. We equate "abuse of that liberty," as used in our constitution, with the phrase "actual malice" as used in *New York Times*. *Id.*

Under both the state and federal constitutions, the extent to which the right to publish may be limited is dependent upon the status of the person who claims to have been defamed. This Court in *Press, Inc. v. Verran* adopted Section 580A, *Restate-*

*ment (Second) of Torts* (1977) as the standard for judging the defamation of a public official and Section 580B for judging the defamation of a private person. Those standards are as follows:

§ 580A. *Defamation of Public Official or Public Figure.* One who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other person, or

(b) acts in reckless disregard of these matters.

§ 580B. *Defamation of Private Person.* One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other,

(b) acts in reckless disregard of these matters, or

(c) acts negligently in failing to ascertain them.

569 S.W.2d at 442. With regard to these standards, the Court commented:

We believe that these standards meet the criteria of our federal and state constitutions and we adopt them as the law of this jurisdiction.

*Id.* Obviously, the difference in the standards applicable to public officials and private persons is set forth in Section (c) of 580B. The following rationale stated for the adoption of the Restatement standards in that case is applicable to the case before the Court:

In adopting these standards, we look to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open." We are guided by our belief that the news media have not only a right but a duty to make searching inquiry into all phases of official conduct and to realis-

tically evaluate and assess the performance of duty by public officials.

Only under the most compelling circumstances should the courts place obstacles in the way of the news media, or muzzle or deter their investigative efforts and reporting, even though the end result may be distasteful, despicable and shorn of all sense of fairness. The right of the news media to criticize official conduct is limited solely to their answerability for actual malice, which means that the publication was made with knowledge of its falsity or with reckless disregard for the truth.

Any other standard would have a chilling effect upon one of the most cherished of all the freedoms specified in our bill of rights.

*Id.*

In the case at bar, the news articles obviously dealt with "official conduct," consequently, the first issue is whether the plaintiff was a public official or a private person. In *Press, Inc. v. Verran,* the Court developed further the criteria for making that determination:

The occupant of any position in any branch of government who exercises any public function is subject to the *New York Times* rule as to all conduct in his official capacity or as to any conduct that might adversely affect his fitness for public office, if he has or "appear[s] to the public to have, substantial responsibilities for or control over the conduct of governmental affairs." *Rosenblatt, [v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966).].

This does not necessarily apply only to high public position. . . .

*Id.* at 441. It is a question of law for the court as to whether the plaintiff is a public official within the meaning of the rule stated in *New York Times Co. v. Sullivan* and adopted by this Court in *Press, Inc. v. Verran. See generally Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499–511, 104 S.Ct. 1949, 1959–65, 80 L.Ed.2d 502 (1984) (discussing "the constitutionally-based rule of independent re-

view" in cases involving restrictions on the freedom of speech).

■ The evidence in this case requires no further analysis to reach the conclusion that plaintiff was a public official within the meaning of Article I, Section 19 of the Tennessee Constitution and the First Amendment to the United States Constitution. The Court of Appeals construed the factual issue too narrowly. There may be, as stated by that court, a genuine issue of fact regarding the precise scope of Ferguson's responsibilities; however, the responsibilities acknowledged by Ferguson himself establish him as a public official and officer of the government. The right of the press to criticize government and its agents is not bound by the niceties of titles or the legalistic definition of duties. Ferguson's duties throughout his employment by the County included substantial responsibility with regard to the financial and business affairs of the County. Whether Ferguson or Bond had the primary duty to prepare the warrants for signature and mail the signed warrants to the vendors, which is the only basic fact disputed, is not determinative of a material issue in this case. The efficient management of financial matters is crucial to the proper operation of government. Based on this record, Ferguson appeared to have, and in fact did have, substantial responsibility for and control over the conduct of the financial affairs of the County, which is an integral part of government. Ferguson was, therefore, a public official.

■ The trial court also found that there was no material evidence to support a finding of malice. The Court of Appeals made no finding with regard to malice on the charge of defamation. The record supports the finding of the trial court on the issue of malice and that decision is affirmed.

The decision of the Court of Appeals regarding defamation is reversed, and the judgment of the trial court granting summary judgment to the defendants is affirmed.

The judgment of the Court of Appeals regarding interference with employment is affirmed for the reasons stated in the opinion of that court.

The result is that the judgment of the trial court granting summary judgment for the defendants on all counts is affirmed.

Costs are taxed to the plaintiff.

DROWOTA, O'BRIEN, DAUGHTREY, and ANDERSON, JJ., concur.