IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2017 Session

## JEFFERY TODD BURKE v. SPARTA NEWSPAPERS, INC.

Appeal from the Circuit Court for White County
No. CC-2605    Amy V. Hollars, Judge

_____

## No. M2016-01065-COA-R3-CV

_____

The trial court granted summary judgment to defendant publisher of an allegedly defamatory newspaper article concerning plaintiff. The article was based upon a one-on-one, private interview between the public information officer for the White County Sheriff's Office and a newspaper reporter. The court determined that the interview given by the public information officer constituted an "official action" of government that the article fairly and accurately reported. As such, the court concluded that any alleged defamatory statements included in the article were privileged under the common-law "fair report privilege." Plaintiff appealed, arguing in part, that the fair report privilege does not apply. Because we conclude that the interview did not constitute an official act of government, we reverse the grant of summary judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Case Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

W. I. Howell Acuff, Cookeville, Tennessee, for the appellant, Jeffery Todd Burke.

Philip M. Kirkpatrick, Lucian T. Pera, and J. Bennett Fox, Jr., Nashville, Tennessee, for the appellee, Sparta Newspapers, Inc.

**OPINION**

**I.**

On January 30, 2014, *The Expositor* published an article in its online and print editions written by Pamela Claytor. The article reported on the indictment and arrest of Jeffery Todd Burke.

According to Ms. Claytor's article,[1] Mr. Burke acted as the middleman between a local youth football league and a fundraising company, which provided cookie dough for use in fundraising. The article reported that, after the football league gave him approximately $16,000 from pre-sales of cookie dough, Mr. Burke failed to turn the funds over to the fundraising company. And the football league never received the cookie dough. The article also reported that Mr. Burke was arrested in White County on

---

[1] The article read in full:

Man indicted for theft of money from fundraiser

A man who had been indicted in Smith County for allegedly stealing $11,000 in fundraising collections from a youth football league last fall has now been indicted in White County on similar allegations.

According to the case's lead investigator, Detective Chris Isom of the White County Sheriff Department, in August 2013, Jeffery Todd Burke, of Cookeville, who served as a middleman between the Warrior Football League and a fundraiser company, took a large sum of money, reportedly more than $16,000 from the league that was supposed to be turned over to the fundraiser company for cookie dough the football players sold to raise money for the team.

The league, however, never received the cookie dough they had sold and collected money for.

In October, around the same time that Burke was indicted in Smith County, Det. Isom, along with Det. John Meadows and Deputy Will Whitson, began investigating the case for White County.

In the course of the investigation, Det. Isom says the officers discovered Burke had misappropriated more than $16,000 that had been given to him to pay for the cookie dough, and never turned that money over to the fundraiser company.

At the January meeting of the Grand Jury, Burke was indicted for theft over $10,000.

He was arrested on Jan. 24, 2014, and booked into the White County jail. He was released on $10,000 bond.

Det. Isom says the Warrior Football League has been very cooperative with the investigation.

"We are happy with the case," Det. Isom said. "We are trying to get justice for these kids. It's a shame that kids have to learn a lesson like this so early."

January 24, 2014, and then released on bond. The article further noted that Mr. Burke had previously been indicted on similar charges in Smith County, Tennessee.

Ms. Claytor's sole source for the article was Chris Isom, a detective and the public information officer for the White County Sheriff's Office. Ms. Claytor conducted a one-on-one telephone interview with Detective Isom just prior to the article's publication.

Mr. Burke's counsel contacted the newspaper reporter shortly after the article was published, informing Ms. Claytor that the football league "did, in fact, receive everything that was ordered." In response to communications from the attorney, the editor of the paper acknowledged that the article incorrectly reported the amount of the money involved and stated that the newspaper would "print a clarification noting that correction." But, because Detective Isom verified that the other information reported was accurate, the newspaper stood by the remainder of the story.

On January 30, 2015, Mr. Burke filed suit against Sparta Newspapers, Inc., the publisher of *The Expositor*, in the Circuit Court for White County, Tennessee. Mr. Burke complained that both the print and online editions of the article contained three "errors of fact that cast Plaintiff in a false light and are damaging to his personal and vocational reputation": (1) the amount of money involved; (2) the fact that the cookie dough was never delivered; and (3) the fact that Mr. Burke never delivered the collected funds to the fundraising company. According to Mr. Burke, his performance under the contract "was delayed," but the cookie dough was ultimately delivered more than two months before the case against him was presented to the grand jury.

Sparta Newspapers moved for summary judgment. As grounds, Sparta Newspapers asserted that it was immune from liability because the article was a fair and accurate report of official statements made by Detective Isom in his capacity as the public information officer for the Sheriff's Office. As an additional ground for summary judgment, Sparta Newspapers argued that Mr. Burke was a limited-purpose public figure and that he had not pled nor could he prove actual malice.

In response to the motion for summary judgment, Mr. Burke argued that the article contained more information than Ms. Claytor would have received from the publicly available grand jury bill. Mr. Burke also argued that the newspaper's failure to "make further inquiry . . . in the face of multiple emails from counsel" constituted actual malice.

On April 19, 2016, the trial court entered a written order granting Sparta Newspapers summary judgment and dismissing the case. The court concluded that a conditional privilege applied as the article represented a report of an official act of government, the official act being the one-on-one interview given by Detective Isom to Ms. Claytor. The court further concluded that Mr. Burke failed to set forth facts

3

demonstrating actual malice on the part of Sparta Newspapers. Mr. Burke timely appealed.

## II.

### A.

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The party moving for summary judgment has "the burden of persuading the court that no genuine and material factual issues exist and that it is, therefore, entitled to judgment as a matter of law." *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). If the moving party satisfies its burden, "the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial." *Id.*

In this case, the party moving for summary judgment does not bear the burden of proof at trial. Consequently, "the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015), *cert. denied*, 136 S. Ct. 2452 (2016). Satisfying this burden requires more than a "conclusory assertion that summary judgment is appropriate," rather the movant must set forth specific material facts as to which the movant contends there is no dispute. *Id.*

If a motion for summary judgment is properly supported, the nonmoving party must then come forward with something more than the allegations or denials of its pleadings. *Id.* at 265. The nonmoving party must "by affidavits or one of the other means provided in Tennessee Rule 56, 'set forth specific facts' at the summary judgment stage 'showing that there is a genuine issue for trial.'" *Id.* (quoting Tenn. R. Civ. P. 56.06).

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Martin*, 271 S.W.3d at 84; *Blair*, 130 S.W.3d at 763. Accordingly, we must review the record de novo and make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been met. *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair*, 130 S.W.3d at 763.

4

B.

Our review requires us to determine whether, based on the undisputed facts, the fair report privilege applies to shield Sparta Newspapers from Mr. Burke's claims. Technically, the "privilege is an exception to the normal common-law rule rendering a speaker liable for republication of another's defamatory statement."[2] 2 RODNEY A. SMOLLA, LAW OF DEFAMATION § 8:3 Westlaw (database updated May 2018). It has traditionally protected news media that "make reports of *judicial proceedings* to the public, in order that members of the public may be apprised of what takes place in the proceedings without having been present." *Smith v. Reed*, 944 S.W.2d 623, 625 (Tenn. Ct. App. 1996) (emphasis added).

The fair report privilege allows the news media "to be the eyes and ears of the members of the public who would have been able to witness the proceeding or obtain the information had they been present to see or hear for themselves." *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 285 (Tenn. Ct. App. 2007) (citing W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 115, at 836 (5th ed. 1984)). It does not exist merely to satisfy the public's curiosity about what brings parties to court. Rather, the privilege serves a supervisory function "to the end that the public may have the means of knowing how the duties of their officers are performed, whether faithfully and intelligently or otherwise." *Am. Publ'g Co. v. Gamble*, 90 S.W. 1005, 1008 (Tenn. 1906); *see also* SMOLLA, *supra*, § 8:67 ("The reporter is a surrogate for the public, permitting it to observe through the reporter's eyes how the business of government is being conducted.").

The privilege is qualified rather than absolute. *Langford v. Vanderbilt Univ.*, 318 S.W.2d 568, 574 (Tenn. Ct. App. 1958). For the privilege to apply, the report must be "a fair and accurate summation of the proceeding." *Smith*, 944 S.W.2d at 625. The report must be "fair" in the sense that it exhibits "balance and neutrality." *Id.* The report should not be "slanted or spun to convey an impression materially different from what took place," SMOLLA, *supra*, § 8:75, or include "defamatory observations or comments" by the reporter. *Lewis*, 238 S.W.3d at 284.

A report is "accurate" in the absence of "any false statement of fact regarding what occurred during the proceeding." *Id.* We have previously held that "[t]he report need not be a verbatim" or "technically accurate account in every detail," but the report must "convey[ ] a correct and just impression of what took place." *Id.*

---

[2] The common law treats a republisher of defamatory words as a partner in crime with the original defamer. *See Saunders v. Baxter*, 53 Tenn. 369, 381 (1871) ("The publisher of libelous words, in the contemplation of law, is *particeps criminis* with the utterer.").

In Tennessee, the scope of the fair report privilege originally extended only as far as "report[s] of the proceedings in a court of justice." *Saunders v. Baxter*, 53 Tenn. 369, 381 (1871). Over the years, the scope has expanded to include reports of other matters. We have applied the fair report privilege to reports of the "mere contents of pleadings filed in Court," *Langford v. Vanderbilt Univ.*, 287 S.W.2d 32, 37 (Tenn. 1956), "public meetings of local governmental bodies," *Evans v. Nashville Banner Pub. Co.*, No. 87-164-II, 1988 WL 105718, at *5 (Tenn. Ct. App. Oct. 12, 1988), the "issuance of arrest warrants," *Duncan v. Knoxville Journal Corp.*, No. 03A01-9202CV00059, 1992 WL 136172, at *1 (Tenn. Ct. App. June 19, 1992), the content of a deposition, *Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 323-24 (Tenn. Ct. App. 2012), and the content of a press release issued by a chief of police, *Lewis*, 238 S.W.3d at 286. Thus, our case law makes the scope of the privilege nearly coextensive with that found in the Restatement (Second) of Torts, which extends the privilege to "report[s] of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern." RESTATEMENT (SECOND) OF TORTS § 611 (AM. LAW INST. 1977); *see also Lewis*, 238 S.W.3d at 285.[3]

But the privilege has not been extended "so far as to provide protection from liability for fair and accurate reports of statements made by any governmental employee in any circumstance." *Lewis*, 238 S.W.3d at 285. Rather, it is applicable only "to circumstances involving . . . proceedings or official actions of government *that have been made public*." *Id.* (emphasis added); *see Grant v. Commercial Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *7 (Tenn. Ct. App. Sept. 18, 2015) (holding that "the inclusion of certain investigatory interviews and descriptions clearly falls outside of the scope of the fair report privilege because their ties to any official proceedings are tenuous at best").

Here, the pivotal question is whether all or any portion of the newspaper article reported information from an official action, an official proceeding, or a meeting open to the public that dealt with a matter of public concern. Sparta Newspapers insists that the privilege applies to Ms. Claytor's entire story because the article was a fair and accurate report of the statements Detective Isom made in his official capacity during a private, one-on-one telephone interview. In an affidavit supporting Sparta Newspapers' motion for summary judgment, Detective Isom expounded on this point, stating that "[t]he article accurately attributes to me the statements I made in my official capacity as a Detective and Public Information Officer of the White County Sheriff's Office."

---

[3] Unlike in Tennessee, the Restatement would not extend the fair report privilege to pleadings before the court had taken some action on them. RESTATEMENT (SECOND) OF TORTS § 611 cmt. e (AM. LAW INST. 1977).

6

The trial court concluded that Detective Isom's interview was an official action of government. In doing so, the court analogized an interview given by a public information officer to a press release, which we have previously held to be within the scope of the privilege, or a press conference.

The court also cited to several federal cases, some of which involved interviews, addressing the fair report privilege. For example, in a 2003 case, *Yohe v. Nugent*, the United States Court of Appeals for the First Circuit, applying Massachusetts law, affirmed the grant of summary judgment to two newspapers based on the fair report privilege. 321 F.3d 35, 44 (1st. Cir. 2003). The newspapers asserted the privilege applied to articles based on interviews given by a chief of police. *Id*. at 42. Without analysis, the court held that the newspaper articles squarely fell within the privilege because the report of the police chief "was clearly an 'official statement.'" *Id*. at 43. And in a strikingly similar case to the one here, applying Connecticut law, a federal district court held that an article based on an interview of a public information officer was protected by the privilege. *Bailey v. Corbett*, No. 3:11-CV-1553, 2013 WL 994466, at *2, *4 (D. Conn. Mar. 13, 2013). In that case, the public information officer was "the designated police spokesperson" and "communicate[d] with members of the media to provide public information about arrests and criminal investigations." *Id*. at *2.

Of the cases cited by the trial court, only one, *Hudak v. Times Publishing Co. Inc.*, provided any detailed analysis of whether the printing of a comment, "not made in open court or in a filed court paper," was protected by the fair report privilege. 534 F. Supp. 2d 546, 568 (W.D. Penn. 2008). The comment in question was made by a prosecuting district attorney during an interview with the defendant newspaper. *Id*.

Relying on the "somewhat broad interpretation to the concept of 'reports of an official action or proceeding'" given by Pennsylvania courts, the court concluded that the reported remarks of the district attorney should "be viewed as a 'report' of 'official action' giving rise to a privileged occasion." *Id*. at 572. The court found its conclusion in keeping with the public supervision rationale behind the fair report privilege. The district attorney was "an important elected public official" with "an indisputable obligation to inform the public as to matters occurring within his office." *Id*. So by obtaining "an official comment on a pending criminal matter for the express purpose of public dissemination and then publishing that information, [the newspaper reporter] was furthering the public interest in ensuring 'that those who administer justice should always act under the sense of public responsibility and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.'" *Id*. (quoting *Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884)).

The court rejected the plaintiff's argument that the interview was too casual for the privilege to apply. In doing so, it explained that "[t]he touchstone of the fair report privilege seems to be whether there exist sufficient indicia of 'officialdom' in the

7

reported communication." *Id*. The court found the statements in the interview contained such indicia; "though [the district attorney's] remarks to [the newspaper reporter] occurred in a casual setting, they constituted an official, on-the-record report concerning governmental action undertaken within the scope of [the district attorney's] office." *Id*.

In our view, the interview given by Detective Isom was not itself an official action, official proceeding, or public meeting within the scope of the fair report privilege. Our courts have not extended the fair report privilege so far as to include a private, one-on-one interview as an official action. The requirement that official actions or proceedings be open to the public serves the underlying rationale behind the privilege, allowing the press to be "the eyes and ears of the members of the public *who would have been able to witness the proceeding or obtain the information*." *Lewis*, 238 S.W.3d at 285 (emphasis added); *see also Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 535 n.12 (7th Cir. 1982) ("The interest served by the [fair report] privilege is the public's right to know and be informed of *public* proceedings.") (emphasis added); David A. Elder, *Truth, Accuracy & Neutral Reportage: Beheading the Media Jabberwock's Attempts to Circumvent New York Times v. Sullivan*, 9 VAND. J. ENT. & TECH. L. 551, 763-64 (2007) (noting the nearly unanimous requirement under the common law for the proceeding or report to be public or available to the public). We also find the cases relied upon by the trial court unpersuasive.

1.      Report/Source Distinction

The cases cited by the trial court overlook the distinction between reports of official actions or proceedings on the one hand and sources within the government on the other. *See* SMOLLA, *supra*, § 8:67 ("In both policy and doctrine a key distinction exists between reports of *official government action* and reports of information provided by official government actors."). The public supervision rationale behind the privilege, "that the reporter acts as the 'eyes and ears' of the public in reporting on a proceeding or summarizing a public document," has no application "when a reporter merely publishes a story based in whole or in part on government sources." *Id*. As one commentator explained, "[r]eporting what the prosecutor or law enforcement officer said to a reporter outside the courtroom during an interview is simply the routine use of a source." *Id*.

Certainly, reporters use sources for information on an official action, official proceeding, or official meeting. *See* DAVID A. ELDER, DEFAMATION: A LAWYER'S GUIDE § 3.2 Westlaw, (database updated July 2018) (referring to secondary or indirect sources as an "accepted and justified custom and usage of the mass media"). And the fair report privilege may still apply "where a reporter who purports to report on an official proceeding does not have personal knowledge of the proceeding but instead relies on an intermediary who does." *Bufalino v. Associated Press*, 692 F.2d 266, 271 (2d Cir. 1982). But where reliance was placed on a responsible, trustworthy, and knowledgeable source,

the privilege extends only to the source's account of the official action, official proceeding, or official meeting.

Applying this principle to the article concerning Mr. Burke, the fair report privilege would extend to information provided by Detective Isom that was public and involved official actions or proceedings, e.g., the fact of Mr. Burke's arrest and the details of the grand jury indictment. *See Duncan*, 1992 WL 136172, at *1; Tenn. Code Ann. § 40-13-111 (2012); RESTATEMENT (SECOND) OF TORTS § 611 cmt. h ("An arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is . . . within the conditional privilege . . . ."). But the article went beyond official actions and proceedings. It included information about whether the cookie dough ordered through Mr. Burke was ever delivered and about whether the fundraising company received any funds. The article also included informal remarks on the strength of the case and what "lessons" might have been learned from the incident by the participants in the youth football program. Such details fall outside the scope of the privilege. *See Lewis*, 238 S.W.3d at 286 (concluding that the fair report privilege did not apply because defendant's story "contained [both information gathered from a press release and] other information regarding . . . details . . . that did not come from the press release"); RESTATEMENT (SECOND) OF TORTS § 611 cmt. h ("[S]tatements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under [the fair report privilege].").

2.    Attribution

Even if we were inclined to extend the scope of the fair report privilege to all communications, formal or informal, public or private, of police public information officers or spokespersons, we conclude that the fair report privilege should not apply here. To rely on the fair report privilege, the article should be written in such a manner that an average reader can "understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding." *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985). To accomplish this, "[i]t must be apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings." *Id* at 739; *see also Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 254 (4th Cir. 1988) (liability avoidance requires proper attribution of the report to the original source); ELDER, *supra*, § 3.3 (reasonable identification of source is a precondition to reliance on the fair report privilege).

Here, Ms. Claytor's article did properly attribute the information included in the article to Detective Isom. But Detective Isom was only referred to in the article as the "case's lead investigator." The article never described the detective as being the public

information officer for the White County Sheriff's Office. So even if all communications of a public information officer are official actions within the scope of the fair report privilege, the average reader would not have understood Ms. Claytor's article, either from its context or specific attribution, to have been based upon an official act of government.

Thus, we conclude that summary judgment was not appropriate based on the fair report privilege. The privilege has not been extended "so far as to provide protection from liability for fair and accurate reports of statements made by any governmental employee in any circumstance." *Lewis*, 238 S.W.3d at 285. And we decline to include within the scope of the privilege informal communications, such as a private, one-on-one interview given by a public information officer. But even if we were so inclined, the article failed to properly attribute the comments of Detective Isom as those of a public information officer.

C.

As noted above, in determining whether the fair report privilege applied, the trial court also found "no evidence of actual malice" on the part of Sparta Newspapers in publishing the article. In its brief, Sparta Newspapers argues the lack of evidence of actual malice entitles it summary judgment on an alternative basis.

Under Tennessee law, a prima facie case for defamation requires proof "that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). "Actual malice"[4] rather than mere negligence in failing to ascertain the truth of the allegedly defamatory statement must be shown when the statement "involve[s] public controversy or a matter of public or general concern" and the plaintiff is "either a public official or public figure." *Lewis*, 238 S.W.3d at 296. Where actual malice is required to be shown, the plaintiff must meet its burden by clear and convincing evidence. *Trigg v. Lateway Publishers, Inc.*, 720 S.W.2d 69, 75 (Tenn. Ct. App. 1986).

No one claims that Mr. Burke is a public official, and the trial court made no such determination. *See Ferguson v. Union City Daily Messenger, Inc.*, 845 S.W.2d 162, 166 (Tenn. 1992) (determination of whether a plaintiff is a public official is a question of

---

[4] The United States Supreme Court first applied the "actual malice" standard to "libel actions brought by public officials" in *New York Times Co. v. Sullivan*, 376 U.S. 254, 283 (1964). The Court defined actual malice as publication of a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280. The Court subsequently clarified that application of the actual malice standard also required the existence of "particular public controversies." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

law); *Press, Inc. v. Verran*, 569 S.W.2d 435, 441 (Tenn. 1978) (defining a "public office" as "[a]ny position of employment that carries with it duties and responsibilities affecting the lives, liberty, money or property of a citizen or that may enhance or disrupt his enjoyment of life, his peace and tranquility, or that of his family"). Sparta Newspapers submits that the actual malice standard applies because Mr. Burke "is clearly at least a limited purpose public figure." In light of the trial court's finding that "there is no evidence of actual malice and certainly not clear and convincing evidence of actual malice," Sparta Newspapers claims that it "demonstrate[ed] that [Mr. Burke]'s evidence at the summary judgment stage [wa]s insufficient to establish the nonmoving party's claim." *See Rye*, 477 S.W.3d at 264.

Because it concluded that the entire article was privileged under the fair report privilege, the trial court never reached the issue of whether a heightened burden of proof applied to Mr. Burke's claims. The court only addressed the issue of actual malice in the context of whether it could defeat the privilege. *See Gertz*, 680 F.2d at 535 ("The privilege may be overcome, however, by a showing that the publication was motivated by actual malice."). Although it argues that summary judgment was appropriate on an alternative ground, Sparta Newspapers did not designate the alternative ground for summary judgment in its statement of issues on appeal. So we consider the issue waived. *See Childress v. Union Realty Co., Ltd.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002).

### III.

Based on the foregoing, we reverse the trial court's grant of summary judgment in favor of Sparta Newspapers on the basis of the fair report privilege. This matter is remanded for further proceedings consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE

11