NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0624n.06

Case No. 20-5016

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| DAVID PAUL BOHLER, | ) | **FILED**<br>Nov 04, 2020<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE MIDDLE DISTRICT OF |
| CITY OF FAIRVIEW, JOSEPH COX, | ) | TENNESSEE |
| TIMOTHY SHANE DUNNING, | ) |  |
|  | ) |  |
| Defendants-Appellants. | ) | AMENDED OPINION |
|  | ) |  |

BEFORE: NORRIS, NALBANDIAN, and READLER, Circuit Judges.

CHAD A. READLER, Circuit Judge. Today's case is an additional chapter in a long-running dispute between the Fairview (Tennessee) Police Department and former officer David Bohler. Bohler claims that he quit the department when his superiors threatened him with a demotion motivated by Bohler's prior whistleblowing. Bohler also claims that two fellow officers defamed him by accusing him of misusing his official sick time. The district court granted judgment to Defendants on all claims. Seeing no error in that judgment, we affirm.

BACKGROUND

While working as a detective in the Fairview Police Department, Bohler was contacted by Fairview resident Robert Hamilton, who claimed that another Fairview police officer, Timothy Dunning, was threatening to search Hamilton's home. Hamilton believed the search was

motivated not by legitimate criminal suspicion, but instead by an unrelated civil suit between himself and a friend of Mark Sutton, a high-ranking Fairview police official. Given the unsubstantiated nature of Hamilton's allegation (Bohler found no record of an arrest or police report in the matter), Bohler advised Hamilton that he would be unable to help him.

A few months later, Bohler was asked by the District Attorney to review three pending criminal cases that needed further investigation before moving forward. One involved Hamilton, and it seemingly corroborated Hamilton's prior claims of police misconduct. Both surprised and concerned, Bohler reached out to Hamilton, who informed Bohler that Sutton had directed Dunning to "set up" Hamilton to be falsely arrested. So Bohler raised the matter with his direct superiors, to no avail. He also spoke to the police chief, who directed him to gather information to turn over to the District Attorney. Yet when Bohler reached out to collect information from Joseph Cox, a fellow officer, he was rebuffed. Bohler again called the District Attorney, who eventually dismissed the case against Hamilton. Although the District Attorney claimed the dismissal was based on "a lot of factors," Bohler believes it was a direct result of his whistleblowing.

Bohler alleges that Cox and Dunning soon learned of Bohler's whistleblowing and began to harass him. Some of the harassment related to Bohler's ongoing cancer treatment. Bohler claims that Cox and Dunning accused him of "stealing" sick time when he missed work due to his cancer treatments. Cox and Dunning admit they were looking into Bohler's use of sick leave. But Cox explained that he simply thought the chart posted in the squad room that tracked sick leave was not properly updated by officials, who, out of sympathy, were giving Bohler more sick time than he was allotted. A payroll administrator later explained that under the department's sick leave

policy, Bohler would not need to use sick leave as long as he worked remotely at least two hours a day. And according to Bohler, he often worked from home during this period.

Tensions later boiled over when Bohler married a fellow officer. Upon learning of Bohler's marriage, Scott Collins, the city manager, met with Bohler, ostensibly to discuss the city's anti-nepotism policy. Bohler disputed that his marriage implicated the policy as he did not have a supervisory role over his wife. Collins then mentioned plans by the city to replace the detective position with a rotating investigator role. Bohler took all of this to mean he was being told that he could no longer continue as a detective, and that if he stayed, he would face a demotion and pay cut. Following the meeting, Bohler filed a grievance. Collins responded by scheduling a meeting between himself, Bohler, Sutton, and a former city manager. Believing the deck was stacked against him, Bohler resigned rather than attend the meeting.

Bohler instead turned to the courts. Following a short-lived action in state court, Bohler filed a 10-count suit in federal court against a number of defendants. A flurry of motions and counter motions followed, three of which are relevant here.

First, the district court granted Fairview judgment on the pleadings as to Bohler's due process claim. Agreeing with Bohler that he properly alleged he was deprived a property right when he was constructively discharged by the city, the district court nonetheless concluded that a pre-deprivation hearing likely would have been impractical, and, in any event, that there was no evidence Bohler was denied a post-deprivation hearing. Bohler, in other words, was not denied any process "due" to him as part of his employment.

Second, the district court granted summary judgment to Defendants on Bohler's First Amendment retaliation claim. According to the district court, Bohler could not show that he engaged in constitutionally protected speech or conduct when he acted as an alleged whistleblower

on the Hamilton case. As his duties as an officer included assisting local prosecutors, Bohler was acting as a public employee (not a private citizen) when he made his whistleblowing allegations.

Third, the district court granted summary judgment to Dunning and Cox on Bohler's defamation claim. Deeming Bohler a "limited-purpose public figure" for defamation purposes, the district court required Bohler to show that defendants defamed him with "actual malice." And Bohler failed to do so, said the district court, in part because the allegedly defamatory remark that Bohler was "stealing sick time" was a vague allegation more akin to a suspicion than an affirmative claim. Nor, at all events, could Bohler show any damage to his reputation, as he must under Tennessee law. Bohler timely appealed.

## ANALYSIS

*Standard of Review.* We review the district court's grant of judgment on the pleadings de novo, "treat[ing] all well-pleaded material allegations of the pleadings of the opposing party as true." *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 689 (6th Cir. 2018) (cleaned up). We review the district court's grant of summary judgment de novo, "viewing all the evidence in the light most favorable to the nonmoving party and drawing 'all justifiable inferences' in his favor." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). And while we generally review the denial of a motion to alter or amend judgment for abuse of discretion, we review de novo any legal conclusions made by the district court in denying that motion. *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 798–99 (6th Cir. 2018) (citing *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 476 (6th Cir. 2007)).

*Procedural Due Process.* We begin with Bohler's procedural due process claim. The Due Process Clause of the Fourteenth Amendment forbids a state from "depriv[ing] any person of life,

liberty, or property, without due process of law." U.S. CONST. amend. XIV. A public employee claiming a procedural due process violation by his employer must show that the employee was deprived of a constitutionally protected liberty or property interest, and that the deprivation occurred without the required process. *Hudson v. City of Highland Park*, 943 F.3d 792, 800 (6th Cir. 2019) (citing *Shoemaker v. City of Howell*, 795 F.3d 553, 558–59 (6th Cir. 2015)). Our Federal Constitution, however, does not create the property interest protected by procedural due process; that interest is created and defined, if at all, by independent sources such as state law. *Id.* at 800–01 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)). Where a deprivation of a protected property interest is demonstrated, the next step is to determine what process is due. In making that assessment, we balance (1) the private interest affected, (2) the risk of erroneous decision-making, and the probable value, if any, of additional procedural safeguards, and (3) the government's interest in fiscal and administrative burdens imposed by additional procedural safeguards. *Shoemaker*, 795 F.3d at 559 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Bohler claims (and Fairview does not dispute) that he had a constitutionally protected property interest in his employment as a detective. With that understanding in mind, we ask whether Bohler was "deprived" of that property interest. Ordinarily, where an employee voluntarily resigns, he "relinquishes" his property interest, meaning he has not been "deprived" of a property right. *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004) (quoting *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999)). A resignation is not voluntary, however, when the employee was constructively discharged, that is, when one's "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Medlin v. City of Algood*, 814 F. App'x 7, 14 (6th Cir. 2020) (quoting *Ford*

*v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002)). To decide whether a resignation was due to coercion or duress, we ask whether a plaintiff showed that (1) "the employer deliberately created intolerable working conditions, as perceived by a reasonable person," and (2) whether "the employer did so with the intention of forcing the employee to quit." *Id.* (quoting *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir. 2001) (cleaned up)).

Bohler alleges that he resigned because he was facing a retaliatory demotion and pay cut justified by largely pretextual rationales and purposely designed to make him quit. Collins's first rationale was nepotism, but Bohler alleges he suggested that, to resolve the issue, his wife could quit her job. So Collins shifted his rationale to a purported departmental restructuring that would eliminate the detective role. And when Bohler later filed a grievance, Collins told him that he, along with Sutton, the primary antagonist in Bohler's corruption allegations in the Hamilton case, would hear the grievance. Against this backdrop, Bohler's claim that a reasonable person in his position would feel as though these working conditions were intolerable by design is seemingly sufficient to survive a motion for judgment on the pleadings.

That said, we see no merit in Bohler's claim that he was entitled to a pre-deprivation, pre-termination hearing. Not all deprivations of constitutionally protected property demand a pre- (as opposed to post-) deprivation hearing. *See Parratt v. Taylor*, 451 U.S. 527, 538 (1981), *overruled on other grounds by Daniel v. Williams*, 474 U.S. 327 (1986). Where a deprivation results not from formal state processes but instead from "random and unauthorized act[s] by a state employee," then "postdeprivation tort remedies are all the process that is due, simply because they are the only remedies that the State could be expected to provide." *Zinermon v. Burch*, 494 U.S. 113, 128–29 (1990) (quoting *Parratt*, 451 U.S. at 541). Lacking a crystal ball to predict the future, a "State cannot be required constitutionally to do the impossible" by providing a hearing before

causing injuries it did not expect. *Id.* at 129. Here, it follows that Fairview was required to provide Bohler a pre-deprivation hearing opportunity only if it was not "impractical[]" to do so and where "meaningful means by which to assess the propriety of the State's action" were not otherwise "availabl[e]." *Parratt*, 451 U.S. at 539.

In Bohler's situation, a pre-deprivation hearing would have been impractical, if not impossible. *See Nunn*, 113 F. App'x at 60. When a public employer begins termination proceedings, it largely controls the tempo, and can practically include a pre-deprivation hearing, if required to do so. So where an employee is terminated according to "established state procedures," we evaluate the adequacy of those procedures on their face, without requiring the employee to take the additional step of pleading the inadequacy of post-deprivation remedies. *Mitchell v. Funkhauser*, 375 F.3d 477, 483–84 (6th Cir. 2004). But when an employee resigns, as Bohler did, the employer cannot go back in time to offer a pre-deprivation hearing, with formal charges, notice, and process. *See Nunn*, 113 F. App'x at 60 (explaining that an "employer cannot be required to give notice before an employee takes what appears to be a voluntary act"). In this scenario, Bohler was guaranteed only whatever post-deprivation remedies the state may provide, *see id.,* leaving Bohler to prove why the remedies provided to him were inadequate to redress his injury. *See Mitchell*, 375 F.3d at 483–84.

Bohler has not done so. He has not "prove[n] the inadequacy of state remedies," for example, a post-deprivation hearing. *Id.* For one thing, Bohler did not even request a post-deprivation hearing, making it difficult for him to show the hearing would have been inadequate. *Nunn*, 113 F. App'x at 61. For another thing, Bohler has not demonstrated why state judicial remedies would be inadequate to address his complaints over a demotion and pay cut. After all, when the "thrust of plaintiffs' argument," like here, "is simply breach of contract" that injury

should be redressed by a state contract law action, not a federal § 1983 action. *See Kaminski v. Coulter*, 865 F.3rd 339, 348 (6th Cir. 2017) ("[I]t is neither workable nor within the intent of [§] 1983 to convert every breach of contract claim against a state into a federal claim." (quoting *Ramsey v. Bd. of Educ. of Whitley Cnty.*, 844 F.2d 1268, 1273 (6th Cir. 1988))); *see also Parratt*, 451 U.S. at 544 (resisting transforming the Fourteenth Amendment into a "font of tort law . . . superimposed upon whatever systems may already be administered by the States" (internal quotations and citations omitted)). Here, a state law breach-of-contract action would "provide . . . sufficient due process," even in the absence of a "predeprivation hearing" or a "federal cause of action." *See Leary v. Daeschner*, 228 F.3d 729, 743 (6th Cir. 2000).

*First Amendment Retaliation.* Bohler next disputes the award of summary judgment to Defendants on his First Amendment retaliation claim. Among its many central guarantees, the First Amendment protects "the freedom of speech." U.S. CONST. amend. I. To establish a First Amendment retaliation claim, a § 1983 plaintiff must show that (1) he engaged in constitutionally protected activity, (2) the defendant took an adverse action that caused the plaintiff to suffer an injury that would likely chill one of ordinary firmness from continuing to engage in that activity, and (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) (citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)).

Given Bohler's status as a public employee, our analysis takes on an added dimension. That is, we must determine whether Bohler's speech was subject to the control of his employer. As a public employee, Bohler enjoyed the right, "in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). But "when public employees make statements pursuant to their official duties, the employees are not speaking

as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. In this setting, "[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). To prevail on his First Amendment retaliation claim, then, Bohler must show that: (1) his "speech involved a matter of public concern," (2) his "speech was made as a private citizen, rather than pursuant to [his] official duties," and (3) his "interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in 'promoting the efficiency of the public services it performs through its employees.'" *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012) (citations omitted).

As a starting point, Bohler spoke on a matter of public concern. *Marquardt v. Carlton*, 971 F.3d 546, 549 (6th Cir. 2020) (distinguishing between a matter of public concern and a "personal beef" lacking First Amendment protection). At its core, Bohler's speech is an allegation that local government officials were improperly exploiting the criminal justice system through a false arrest and threats to search one's property to gain leverage in an unrelated civil suit regarding a private citizen. Allegations of governmental misconduct are quintessential matters of public concern. *Lane*, 573 U.S. at 241; *see also Handy-Clay*, 695 F.3d at 543.

Yet while Bohler's speech addressed a matter of public concern, it nonetheless was not made in his capacity as a private citizen. *See Garcetti*, 547 U.S. at 421. Bohler's conversations with the District Attorney questioning the motivations driving the Hamilton investigation and prosecution occurred pursuant to Bohler's "official duties." *Handy-Clay*, 695 F.3d at 541–42 (explaining that conduct is part of one's official duties where it "directly related to [his] alleged job responsibilities and, thus, . . . [was] made in [his] capacity as an employee and not a private

citizen"). According to Bohler's job description, a detective "[c]oordinates activities with the Prosecutor's and District Attorney's office in an effort to avoid mishandling of cases and/or dismissal of charges." And prosecuting Hamilton based on insufficient evidence or on materials tainted by purported improper motivations of police officers would no doubt be "mishandling" the prosecution. *See Mishandle*, Merriam-Webster (Online Ed. 2020) (to "mishandle" a case is to manage it "wrongly" or "ignorantly"). By raising concerns about the motivations underlying the Hamilton prosecution, Bohler was thus coordinating with the District Attorney to help prevent the case from being mishandled.

*Handy-Clay* does not suggest otherwise. In complaining about potential corruption, the *Handy-Clay* plaintiff was speaking as a private citizen. 695 F.3d at 543. Making complaints of that ilk were not part of her "official duties as public records coordinator," nor was she asked to report on the matter. *Id*. at 542. Here, not only did Bohler act in accordance with his job description when he informed the District Attorney of possible police corruption, but he also conceded that he was instructed by the police chief to gather information on the potential corruption to turn over to the District Attorney.

Perhaps, as Bohler argues, a police officer has the right but not the obligation to investigate and make arrests in regard to potential criminal activity such as the corruption of fellow officers. But that is neither here nor there. Bohler, it bears repeating, had an express and independent duty to coordinate with the District Attorney to prevent the mishandling of prosecutions. Nor would Bohler's argument carry the day even in the absence of an express duty to act. Consider an extreme situation where a detective discovered that evidence for the prosecution's case-in-chief was obtained by police torture of a suspect, in violation of 18 U.S.C. § 242, and perhaps state law as well. Even if the detective did not have an express duty to recommend the prosecution of the

10

participating officers, the detective likely still had an obligation to coordinate with the District Attorney to the extent that such illicitly acquired evidence would affect the integrity of her prosecution.

*Defamation.* Bohler also challenges the district court's dismissal of his defamation claim. Under Tennessee law, defamation occurs when (1) a party communicates a statement to a third person while knowing that statement is false and defaming to another or (2) the party communicates the statement with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (citations omitted).

The elements of defamation are modified where the subject of the communication is deemed to be a "public official." If so, and if the allegedly defamatory statement relates to the "official capacity" of the public official or "any conduct that might adversely affect" the public official's "fitness for public office," the speaker (or writer) of the statement can be held liable for defamation only if she spoke with "actual malice," that is, the speaker knew the defamatory statement was false or acted in "reckless disregard" of the falsity of the defamatory statement. *Press, Inc. v. Verran*, 569 S.W.2d 435, 441 (Tenn. 1978).

We begin with this latter question: whether Bohler is considered a public official under Tennessee law. In Tennessee, that designation is not limited to high ranking officials. It also applies to "[a]ny position of employment that carries with it duties and responsibilities affecting the lives, liberty, money or property of a citizen or that may enhance or disrupt his enjoyment of life, his peace and tranquility, or that of his family." *Id.* Applying this generous definition of "public official," the Tennessee courts consider a law enforcement officer to be a public official for purposes of a defamation suit. *Murray v. Lineberry*, 69 S.W.3d 560, 563 (Tenn. Ct. App. 2001)

("In *Selby*, we held that a police officer was a public official. We stated that a police officer's 'duties affect the lives, liberty and property of citizens . . . .' We believe that the same is true of any law enforcement officer.") (quoting *Selby v. Ilabaca*, No. 02A01–9503–CV–00058, 1996 WL 219620, at *4 (Tenn. Ct. App. 1996)); *see also Press, Inc.*, 569 S.W.2d at 441; *Hibdon v. Grabowski*, 195 S.W.3d 48, 60 n.6 (Tenn. Ct. App. 2005) (collecting cases in which particular government officials, including a sheriff's deputy, were considered to be "public figures"). As we are bound by a directly applicable holding of a state's high court on matters of state law—and in the absence of such a holding, look to intermediate appellate state court precedent—these Tennessee cases control here. *See Lukas v. McPeak*, 730 F.3d 635, 637 (6th Cir. 2013).

True, in *Young v. Gannett Satellite Info. Network, Inc.,* we expressed some doubt over whether rank-and-file police officers are public officials. 734 F.3d 544, 549–50 (6th Cir. 2013). But *Gannett* applied Ohio (not Tennessee) law. And even then, *Gannett* ultimately assumed that a rank-and-file police officer was a public official in the defamation context. *Id.* at 550. In so doing, we noted that an Ohio Supreme Court case at issue may have erroneously reached that same conclusion because it relied on United States Supreme Court cases that involved *high*-ranking police officials. *Id.* at 549–50. But there is no reason why Ohio, Tennessee, or any other state cannot expand its own protections for public debate beyond those required by the First Amendment. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347 (1974) ("[T]he States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."); *Campbell v. Robinson*, 955 S.W.2d 609, 611 (Tenn. Ct. App. 1997) ("[S]tates can reach lower into the governmental hierarchy than that which is required by the United States Constitution and lesser officers or employees can be designated 'public officials.'"); *see also* Jeffery S. Sutton, *51 Imperfect Solutions* 204–08 (2018) (observing

that states have raised legal protections above the minimum baseline set by federal constitutional law in the areas of eminent domain, religious liberties, and gay marriage); *Who is a "public official" for purposes of defamation action*, 44 A.L.R. 193, § 21(a) (1996 & Supp. 2020) (collecting cases where courts have held that municipal police officers are public officials for defamation purposes).

With Bohler considered a public official for purposes of defamation law, we are left to resolve whether the statements at issue concern his fitness for public office. Ordinarily, whether and when one takes sick leave would likely be considered a "private" matter, not something "connected with [one's] official duties." *Murray*, 69 S.W.3d at 563. But statements about private conduct take on a public flavor when they "might adversely affect" an individual's "fitness for public office." *Id.* (quoting *Press Inc.*, 569 S.W.2d at 441). That was the case in *Murray*, where statements that a deputy sheriff was involved in domestic violence were, for purposes of defamation law, deemed to affect the official's fitness for public service. *Id.* So too here. Cox's and Dunning's alleged statements that Bohler was "stealing" sick time are, at bottom, accusations questioning Bohler's diligence or honesty. It is no leap to imply from those comments that Bohler is thus unfit for public office.

That conclusion, coupled with Bohler's status as a public official, raise the evidentiary bar for Bohler: He must prove that Cox's and Dunning's statements were made with actual malice. *Press Inc.*, 569 S.W.2d at 441. In other words, Bohler must show that the two officers made the statements knowing that they were false, or, at the very least, with "reckless disregard for the truth." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989); *accord Ferguson v. Union City Daily Messenger, Inc.*, 845 S.W.2d 162, 165–66 (Tenn. 1992). As to that lower standard, reckless disregard "requires more than a departure from reasonably prudent conduct."

*Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 688. Instead, the officers must have "a high degree of awareness of . . . probable falsity." *Id.* at 667 (citations omitted).

Bohler fails to clear that high bar. As the trial court noted, Bohler's own evidence suggested that it was easy for an onlooker to think that Bohler was taking more sick time than he was allotted. Indeed, despite the fact that Bohler was clearly on leave for cancer treatment, the posted chart that tracked Bohler's sick leave did not change. Ultimately, it seemingly was untrue that Bohler was exceeding his allotted sick time, as he presumably met the two-hour work requirement necessary for him to avoid using sick days. But neither the ultimate falsity of the statement nor the discoverability of the truth alone demonstrates that Cox or Dunning had a subjective belief that the statement probably was false. Rather, as the record reflects, a person in that situation could fairly think that Bohler was receiving more sick time than he was allotted. Perhaps the officers, after some investigation, could have discovered whether that was true. But a "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard" for the purposes of actual malice. *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 688 (citations omitted).

Nor is any improper motive on the part of Cox or Dunning a decisive factor in proving "actual malice." Bohler believes that the two officers made statements regarding Bohler's dishonesty because they were upset with Bohler. The "actual malice standard," however, "is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 666 (citations omitted); *accord Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W. 270, 301 (Tenn. Ct. App. 2007). Instead, actual malice "requires at a minimum that the statements were made with a reckless disregard for the truth." *Harte-Hanks*

*Commc'ns, Inc.*, 491 U.S. at 667 (citations omitted). And here, Bohler simply has not shown that

Cox's and Dunning's allegedly defamatory statements reflect such reckless disregard.

### CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.