IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 15, 2025 Session

## RONALD AUSTIN, ET AL. v. ANGELA KAY PLESE

Appeal from the Circuit Court for Knox County
No. 3-198-20      Deborah C. Stevens, Judge

No. E2024-00586-COA-R3-CV

This appeal arises from a lawsuit over defamation and false light invasion of privacy. Ronald Austin and Linda Austin ("Mr." and "Ms. Austin," respectively) ("Plaintiffs," collectively) were neighbors of Angela Kay Plese ("Defendant"). Plaintiffs and Defendant did not get along. At one point, Defendant posted certain statements on Facebook about Ms. Austin, including that Ms. Austin had been convicted in Texas of deadly conduct with a gun. While Ms. Austin had pled guilty many years earlier to a Texas statute called "deadly conduct," this was in the context of her reaching a better deal in a DUI case. Ms. Austin's matter did not involve a gun. Plaintiffs sued Defendant for defamation and false light in the Circuit Court for Knox County ("the Trial Court"). After a trial, the Trial Court found in favor of Plaintiffs, awarding $95,100 in total damages for Ms. Austin's medical expenses, damage to reputation, emotional distress, punitive damages, as well as Mr. Austin's loss of consortium.[1] Defendant appeals. We vacate that portion of the Trial Court's award concerning damage to Ms. Austin's reputation since the record contains no evidence of such damage. Therefore, we modify the judgment to $75,100. Otherwise, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Nathaniel Evans, Knoxville, Tennessee, for the appellant, Angela Kay Plese.

Grant E. Mitchell, Knoxville, Tennessee, for the appellees, Ronald Austin and Linda Austin.

---

[1] The Trial Court appears to have made a mathematical error and stated the total damages as $101,000.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; and Heather C. Ross, Senior Assistant Attorney General, for the appellee, the State of Tennessee.

# OPINION

## Background

Plaintiffs and Defendant were once neighbors in Knox County. Tensions arose between them when Plaintiffs built a fence on their property and put up orange traffic cones in front of their house. Defendant opposed these measures, and bitter exchanges followed. At an October 2019 homeowners' association meeting concerning the fence at issue, Defendant displayed Ms. Austin's mugshot from an old arrest in Texas. Ms. Austin was deeply distressed by this. On June 1, 2020, Defendant posted certain statements about Plaintiffs, and Ms. Austin in particular, on her Facebook page. The relevant statements are as follows:

> When servicemen or guest parked in that area they would often get cussed out by Ron [Austin].

> I finally did a background check hoping I was just overreacting. The criminal check revealed that Linda Austin has a criminal record in Texas. [Plaintiffs] moved to Knoxville from Texas after she was arrested for "Deadly Conduct" with use of gun. I realized my instincts were correct and I needed to protect myself from the Austin family.

> Linda Austin pleaded guilty to the charges of Deadly Conduct in Texas. This explained my experience of being attacked in the cul de sac by the Austin family.

As Defendant now acknowledges, her statement that Ms. Austin had been arrested for a gun-related offense was false. In truth, Ms. Austin had been charged with a DUI in Texas some 15 years before. For insurance purposes, Ms. Austin pled guilty to a misdemeanor under a Texas statute called "Deadly Conduct."[2] Although the Texas statute

---

[2] The Texas statute, TEX. PENAL CODE § 22.05, provides:

**§ 22.05. Deadly Conduct**

(a) A person commits an offense if he recklessly engages in conduct that places another in imminent danger of serious bodily injury.

contemplates some offenses in which a firearm is used, Ms. Austin's offense did not involve a firearm. On June 4, 2020, Plaintiffs sent Defendant a cease-and-desist letter through counsel demanding an apology and retraction. Defendant declined to apologize or retract at that time. Defendant would offer to retract only around a year later.

In June 2020, Plaintiffs sued Defendant for defamation and false light invasion of privacy. Plaintiffs also sought punitive damages. In December 2020, Plaintiffs filed an amended complaint, narrowing the statements sued upon. Defendant answered in opposition. Defendant did not request a jury trial, nor did she request bifurcation of the proceedings for punitive damages. In September 2023, the Trial Court conducted a bench trial. Plaintiffs and Defendant testified. Ms. Austin's psychiatrist, Dr. Allen Rigell ("Dr. Rigell"), testified also.

Ms. Austin testified first. Ms. Austin had previously sought mental health treatment before the underlying events of this case. According to Ms. Austin, her DUI incident was "the biggest mistake" of her life. Ms. Austin said that her criminal record in Texas was subject to an "order of nondisclosure," and she had not expected to hear about it again. Shortly after Defendant posted her statements on Facebook, Mr. Austin showed Ms. Austin the statements on his phone, where one of the neighbors had forwarded it. Ms. Austin testified to her reaction to the statements:

> Q. And so being portrayed that way and having those statements made that you say are false, how did that impact your family?
> A. It devastated my family. We -- we were humiliated. We were frightened of what -- you know, if someone is thinking that I was arrested with a gun and was attacking one of my neighbors. I knew that people must -- might appear to them as somebody to be fearful of.
> It was just -- I don't think I have words for it. It was just an unbelievable situation where we were -- just couldn't make sense of it. We could not make sense of it.

---

(b) A person commits an offense if he knowingly discharges a firearm at or in the direction of:
(1) one or more individuals; or
(2) a habitation, building, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied.
(c) Recklessness and danger are presumed if the actor knowingly pointed a firearm at or in the direction of another whether or not the actor believed the firearm to be loaded.
(d) For purposes of this section, "building," "habitation," and "vehicle" have the meanings assigned those terms by Section 30.01.
(e) An offense under Subsection (a) is a Class A misdemeanor. An offense under Subsection (b) is a felony of the third degree.

Q. You talked earlier about some of the hobbies or organizations you had in the community. How did this impact your involvement with those?

A. I had become very involved with my women's group Akima, which is a group that does work in the area. Raises money for charities. I immediately felt like I needed to step down so that I would not sully their good name with this horrific, you know, lie going around. I stopped seeing my friends. I stopped keeping -- I stopped doing things I normally did. I didn't go to the food bank anymore. I stopped seeing clients. I couldn't leave the house.

Q. What about your visits to Dr. Rigell and Dr. Brown? How were those impacted by the June 1, 2020, post?

A. After that happened, that was what consumed our discussions. The impact of this person putting this lie out there about me. You know, I couldn't -- I couldn't understand why it was happening. I just -- that's the thing that was hardest. It's just why would someone do something like that.

Q. Were there any changes in frequency, medications, anything like that?

A. Yeah. Unfortunately, yeah, I was given quite a few new medications at that time to sleep. Try to bring the anxiety down. To be able to eat, take a shower, get up out of bed. Those things.

Q. I'll --

A. And you asked -- excuse me. You asked about the frequency. And the frequency increased from maybe, you know, three times a year with Dr. Rigell to weekly.

   Dr. Brown was my psychotherapist that I did talk therapy with, and that increased to two to three times a week.

Dr. Rigell, an outpatient adult psychiatrist who treated Ms. Austin, testified next. Dr. Rigell characterized Ms. Austin's trauma as "severe" in the wake of Defendant's June 2020 Facebook posts. He said that her resulting treatment was "necessary." On cross-examination, Dr. Rigell stated:

Q. But reliving the old DUI was a trigger, if you will?

A. In this circumstance, the reactivation of the re-traumatization in my estimation was the loss of control. The feeling that power had been taken from her without stimulus. So the event in my mind wasn't necessarily the reminder of the DUI. It was that moment where there was that threat that power and control had been taken away.

   Now, what can happen when somebody has experienced a previous trauma is that those same symptoms can, like you said, be re-triggered. And so the symptom that she experienced related to that DUI, I would assume are

-4-

related to her previous treatment of the trauma versus talking about the DUI itself.

Mr. Austin testified as well.  Regarding the effect that Defendant's statements had on his family, Mr. Austin stated:

Q. Okay.  As a result of these things, what happened to your family at that time?
A. We were devastated.  We were back to -- I think, as Dr. Rigell said, back to a traumatic event.

***

Q. We've talked with Mrs. Austin's psychiatrist this morning and discussed specific conditions.  Can you tell me whether these comments had an impact on you personally?
A. Yes, they did.
Q. In what way?
A. I -- I can remember myself, kind of like my wife explained, just not knowing.  I mean, feeling that black.  And my number-one concern was whether my wife was going to make it through this because it was such a hard experience when she got the DUI fifteen or sixteen years earlier.  And I thought -- honestly, because I travel with my business quite often, my big concern was is [sic] that she was going to hurt herself while I was away on a trip.

Asked what harm Defendant's Facebook statements had caused him, Mr. Austin stated: "The harm that I had was my reputation being broadcast that I had attacked the defendant, and the harm of watching my wife suffer."

Last to testify was Defendant.  Asked whether she believed that her Facebook post about Ms. Austin was true at the time it was made, Defendant testified:

Q. So when you -- when you made that post, or not -- when you put the message on the post about that particular conviction of Mrs. Austin, did you believe that to be true?
A. I did.  I had no reason not to believe that it was true.
Q. Did you understand -- had you ever heard of this statute before?
A. No, I hadn't.  So I didn't know about the statute.
Q. You had said that -- you said in that message that it involved a gun.
A. Exactly.

Q. Why did you say that?

A. Well, I went online to -- and I pulled up the statute in Texas and it explained what that particular charge was. And in the description, they said that it always involved a gun. It was a misdemeanor if you didn't discharge the gun, and it was a felony if you discharge the gun. And so that's why I thought a gun was involved in that deadly conduct.

Q. And how long did it take you to realize that the deadly conduct statute might include a vehicle? It was any weapon. It didn't have to be a gun.

A. It was a long time after. It was after my initial attorneys got involved and they were able to get more information.

Q. So when you -- when they had first given you that cease and desist letter, did you still think that you were correct?

A. I did. I hadn't -- you know, I had no reason to believe that I was in error at that point.

Q. Right. Did they tell you specifically how you were wrong?

A. No. No.

On cross-examination, Defendant testified that she did not understand that her Facebook messages would be public. Defendant also testified that she did not know whether Ms. Austin was upset by her actions at the homeowners' association meeting. However, Defendant had testified at her deposition that she was able to observe that Plaintiffs were visibly upset.

At the close of trial, the Trial Court found certain of Defendant's statements tortious. The Trial Court then asked the parties to submit briefs on the recoverability of Mr. Austin's damages and whether a "failure to investigate" holding in *McCluen v. Roane County Times, Inc.*, 936 S.W.2d 936 (Tenn. Ct. App. 1996) impacted the recoverability of punitive damages. Along with their post-trial brief, Plaintiffs submitted a portion of Mr. Austin's deposition in support of an argument for loss of consortium,[3] which they had not pled.

---

[3] Mr. Austin testified in his deposition as follows:

Q. Okay. Back to we originated this discussion talking about your damages, okay, and talking about you said the reputation was number one. You said there was a second one. The suffering, the pain and suffering.

A. The pain and suffering, yes.

Q. Discuss that, please.

A. I had to somehow help my wife through a time that was unimaginable and unbearable. I cried. I didn't know what to do. I wanted to help her and she was devastated. She was in bed. The things that she had been doing in the community and the jobs that she was doing were vaporized.

In March 2024, the Trial Court entered its final order.  The Trial Court found in Plaintiffs' favor, stating in significant part:

> The tort of defamation includes libel and slander. Slander is the speaking of defamatory words and libel is the publishing of defamatory words.  To establish a prima facie case of defamation, a plaintiff must prove that: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.  *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (citations omitted).  There was no testimony that either Mr. or Mrs. Austin were public figures, therefore this Court finds that this is a claim for defamation to a "private figure" case and did not involve speech of public concern.  T.P.I.—Civil 7.02, see comments regarding ordinary, non-privileged defamation.
>
> In this case, it is acknowledged that the statements at issue were published by Mrs. Plese to her Facebook account.  There was undisputed testimony that Mrs. Plese has more than 2000 followers on Facebook.  Mrs. Plese was an active participant on Facebook. The Court finds that the statements were published to third parties.  *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50-52 (Tenn. Ct. App. 2013).
>
> For a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation.  A libel does not occur simply because the subject of a publication finds the publication annoying, offensive or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule.  They must carry with them an element of disgrace. *Stones River Motors, Inc. v. Mid-South Publ'g Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App 1983) (citations omitted). See also, T.P.I.--Civil 7.01 "Defamation" Defined.  (22nd edition, Sept. 2022).
>
> Damages from false and misleading statements cannot be presumed; actual damages must be sustained and proved.  *Davis v. Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001).  The Court must determine whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering.  *Murray v. Lineberry*, 69 S.W.3d 560, 564 (Tenn. Ct. App. 2001).
>
> Truth is a defense to a defamation claim.
>
> The tort of false light was recognized as a separate tort by the Tennessee Supreme Court in the case of *West v. Media General Convergence, Inc.*, 53 S.W.3d 640 (Tenn. 2001).  One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability if the false light would be highly offensive to

a reasonable person and the actor had knowledge or acted in reckless disregard as to the falsity of the publicized matter. *Id*. at 643-644. See also, *Lee v. Mitchell*, 2023 WL 5286117 (Tenn. Ct. App., Aug. 17, 2023). In a false light claim, the facts may be true, but the angle from which the facts are presented, or the omission of certain material facts resulting in placing the plaintiff in a false light. Id. at 646. The Court chose not to adopt actual malice as the appropriate standard for false light claims when asserted against a private individual about matters of private concern. In addition, our Supreme Court recognized that the right to privacy is a personal right. As such, it may not be asserted by a member of the individuals family. *Id*. at 648 (citing Section 6521 of the Restatement (Second) of Torts (1977)). Damages for false light must be specifically plead and proven. There must be actual damages, but the plaintiff need not prove special or out-of-pocket damages, as evidence of injury to standing in the community, humiliation, or emotional distress is sufficient. *West*, 53 S.W.3d at 648. Finally, the Court noted that the plaintiff may proceed under the alternative theories of libel or false light, or both although he or she can have but one recovery for a single instance of publicity. *West*, 53 S.W.3d at 647.

As a matter of law, the Court finds that the statement that "when servicemen or guest parked in the cul de sac, they were cussed out by Ron Austin" to not be defamatory and it did not meet the criteria to place the Plaintiff Ron Austin in a fault light. They may have been rude or disagreeable statements, but they did not rise to the level of defamation and did not cause a serious threat to Mr. Austin's reputation.

As to the statement, "Linda Austin pleaded guilty to the charge of Deadly Conduct in Texas. This explained my experience of being attacked in the cul de sac by the Austin family", the Court finds that the first part of the statement is not defamatory because it is true. However, since Mrs. Plese admitted in her deposition that she knew that Mrs. Austin was upset by the disclosure of her criminal charges to the HOA board, her further publication of the statement was intended to paint the Plaintiff Linda Austin in a false light. As to the second part, the Court finds that it is neither defamatory nor place the Plaintiffs in false light because it is admitted that Mr. Austin called Mrs. Plese white trash and cursed at her in the cul de sac which would be a verbal attack. There is no statement that Mrs. Plese states that she was physically attacked by Mr. Austin and the Court declines to read the word physical into the statement based upon the testimony of the parties and the postings in Facebook.

As to the statement that "The criminal check revealed that Linda Austin has a criminal record in Texas. They moved to Knoxville from Texas after she was arrested for Deadly Conduct with use of a gun", the Court finds

-8-

the statement to be defamatory and to place Linda Austin in false light. The statement was defamatory because it was made with reckless disregard of the truth because Mrs. Plese admitted that she was not a lawyer and not capable of understanding the nuances of a criminal statute and she made no effort to confirm the truthfulness of her statement. She did however know from her background report that Mrs. Austin pled to a misdemeanor charge and not a felony charge.

The Court does not find the testimony of Mrs. Plese to be credible that she did not understand who could see her posts on Facebook.

The Court does not find the testimony of Mrs. Plese to be credible when she testified that it did not cross her mind that her post might harm someone in the Austin family. This is particularly true in light of the known reaction of Mrs. Austin to the mug shot display by Mrs. Plese at the HOA meeting and then choosing to post to social media alleging a type of conviction without confirming the accuracy of the statement.

**Damages**

a. Damages for Linda Austin

The Court finds that Mrs. Plese defamed Mrs. Austin based upon the statements that were posted on Facebook. The Court finds that Mrs. Austin proved $5100 in medical expenses.

The Court finds that Ms. Plese's post on Facebook was distributed to all of her "friends" on Facebook and that Mr. Austin testified that based upon his review of her account she had at least 2000 friends who would have had access to the posting.

In addition, the Court finds that Mrs. Austin's testimony about the impact of the defamatory statements to be credible. Her testimony was supported by the testimony of her husband and her treating doctor and photographs that were used to illustrate her life before the posting of statements by Mrs. Plese and her life after the posting. She testified that the actions of Mrs. Plese triggered events from Mrs. Austin's past. She testified that after the posting, she was embarrassed and withdrawn and did not want to participate in daily life. Her husband testified that when he would leave to go out of town for business, he constantly worried that his wife was in such a dark place that she might be tempted to take her own life. For a significant period of time, her doctor testified that she had difficulty managing stress, suffered insomnia, and suffered from moments of despair and hopelessness. Although the Austins are not seeking any economic damage from the sale of their house in Knoxville and their subsequent move

to Florida, it was clear that the move was connected to Mrs. Austin's relationship with her neighbor and the impact on Mrs. Austin's well-being. The Court recognizes that Mrs. Austin had preexisting mental health issues requiring therapy visits, the visits increased, and the emotions were more intensified during a period of time after the Facebook posting. Dr. Rigell testified that she was "isolating, experiencing nightmares and dissociative experiences" based on the trauma caused by her neighbor.

Considering the notes provided by Dr. Rigell, the testimony of Mrs. Austin and in consideration of her pre-existing and continuing mental health issues, the Court finds that the charges for Dr. Brown between June of 2020 and December of 2021 and the treatment charges of Dr. Rigell from June 2020 through February 2020 to be treatment causally related to the actions of Mrs. Plese. Those medical expenses total $5100.00[.]

Based upon an evaluation of the credibility [of] the witnesses presented and the medical records, the Court finds that Mrs. Austin is entitled to damages for injury to her reputation and for emotional distress that were caused by the defamation of the Defendant. The Court awards damages to Mrs. Austin in the amount of $5100.00 in medical expenses, $20,000.00 in damages to her reputation and $25,000.00 for emotional distress for a total compensatory award to Linda Austin in the amount of $51,000.00.

In addition, the Court finds that Mrs. Austin has presented clear and convincing evidence of the malicious and reckless behavior of the Defendant in making the Facebook post. Mrs. Plese was aware of the emotional distress caused by the display of Mrs. Austin's mugshot at the HOA meeting in August of 2019, and without confirming the accuracy of a statement, she chose on June 1, 2020 to post to Facebook that Mrs. Austin had been convicted of Dangerous Conduct with a gun even though the report she received indicated a conviction of Dangerous Conduct with an unidentified weapon. The Court finds that Mrs. Austin is entitled to an award of punitive damages in the amount of $25,000.00.

b. Damages for Ronald Austin

As previously, indicated the Court does not find that Mr. Austin proved a defamatory statement was made about him.

However, Mr. Austin testified at length about the significant impact of Mrs. Plese's defamatory Facebook post about his wife. Although a claim for consortium was not specifically pled, the Court notes that in discovery and in deposition he testified that an element of his damages was his consortium claim. He also testified at trial about the impact of his wife's

-10-

depression and anxiety on his life, including his fear of leaving her alone because of her depression.

The Court finds that the pleadings should be amended to conform to the evidence and include Mr. Austin's claim for a loss of consortium. The Court finds that Mr. Austin is entitled to loss of consortium damages in the amount of $20,000.00.

**IT IS THEREFORE ORDERED**, for all the reasons set forth above, that Ronald and Linda Austin are entitled to an award of Compensatory Damages against the Defendant Angela Kay Plese in the amount of SEVENTY-SIX THOUSAND DOLLARS ($76,000.00) and to an award of Punitive Damages in favor of Linda Austin against Angela Plese in the amount of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00); for a total judgment in the amount of ONE HUNDRED ONE THOUSAND DOLLARS ($101,000) plus, statutory post-judgment interest. Costs are taxed to the Defendant for which execution may issue.

Defendant timely appealed to this Court.

### Discussion

We restate and consolidate Defendant's issues as follows: 1) whether the Trial Court erred in finding Defendant liable for defamation and false light; 2) whether the Trial Court erred in awarding punitive damages against Defendant, including by failing to hold a separate proceeding pursuant to Tenn. Code Ann. § 29-39-104(a)(2) or clearly setting out sufficient reasoning to support punitive damages pursuant to Tenn. Code Ann. § 29-39-104(a)(4); 3) if Defendant is liable for defamation or false light, whether the Trial Court erred in its award of compensatory damages because Plaintiffs' damages were not caused by Defendant's defamation or false light; and 4) with regard to Mr. Austin, whether the Trial Court erred in awarding damages for loss of consortium, whether Defendant lacked sufficient notice of the claim prior to trial, and whether the Trial Court erred in amending the pleadings.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). With respect to credibility determinations, the Tennessee Supreme Court has instructed:

-11-

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, --- U.S. ----, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

We first address whether the Trial Court erred in finding Defendant liable for defamation and false light. We have articulated what constitutes a *prima facie* claim of defamation in Tennessee as follows:

The elements of a prima facie case of defamation in Tennessee are: (1) the defendant published a statement with (2) "knowledge that the statement is false and defaming" to the plaintiff, or with "reckless disregard for the truth of the statement," or "negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (citing RESTATEMENT (SECOND) OF TORTS § 580 B (1977), and *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978)). In this context, " '[p]ublication' is a term of art meaning the communication of defamatory matter to a third person." *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 821 (Tenn. 1994); *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013). With slander, " 'publication' occurs when the defamatory matter is spoken." *Brown*, 428 S.W.3d at 50.

This court has previously held:

"For a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation. A libel does not

occur simply because the subject of a publication finds the publication annoying, offensive or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule. They must carry with them an element 'of disgrace.' "

*McWhorter v. Barre*, 132 S.W.3d 354, 364 (Tenn. Ct. App. 2003) (quoting *Stones River Motors, Inc. v. Mid-South Publ'g Co., Inc.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983)). Moreover, the damaging words must be false; "[i]f [the words] are true, or essentially true, they are not actionable, even though the published statement contains other inaccuracies which are not damaging." *Stones River*, 651 S.W.2d at 719; *see also Brown*, 428 S.W.3d at 50. The determination of "[w]hether a communication is capable of conveying a defamatory meaning" presents a question of law and is, thus, reviewed de novo. *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000).

\*\*\*

To make out a claim for defamation, a plaintiff must prove that "the defamation resulted in injury to the person's character and reputation." *Brown*, 428 S.W.3d at 50. In a defamation suit, damages cannot be presumed; rather, a plaintiff must sustain and prove actual damages. *Id*. at 51 (citing *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001)). As to damages, " 'the issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering.' " *Id*. (quoting *Murray v. Lineberry*, 69 S.W.3d 560, 564 (Tenn. Ct. App. 2001)).

*McGuffey v. Belmont Weekday Sch.*, No. M2019-01413-COA-R3-CV, 2020 WL 2754896, at \*14, 17 (Tenn. Ct. App. May 27, 2020), *perm. app. denied Sept. 16, 2020*.

With respect to the separate tort of false light invasion of privacy, this Court has discussed as follows:

Our Supreme Court has adopted the following definition of the tort of false light invasion of privacy:

"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

-13-

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

*West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 644 (Tenn. 2001) (quoting RESTATEMENT (SECOND) OF TORTS § 652E (1977)). In *West*, the Court "departed from the Restatement by stating that Tennessee does not require a plaintiff asserting a false light cause of action to prove actual malice unless the plaintiff is a public official or public figure." *Loftis v. Rayburn*, No. M2017-01502-COA-R3-CV, 2018 WL 1895842, at *7 (Tenn. Ct. App. Apr. 20, 2018). A private plaintiff must also show actual malice when asserting a claim concerning "a matter of public concern." *West*, 53 S.W.3d at 647; *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 303 (Tenn. Ct. App. 2007).

***

Ms. McGuffey has failed to establish the element of damages necessary for a claim of false light invasion of privacy. For such a claim, she was required to show evidence of "injury to standing in the community, humiliation, or emotional distress." *West*, 53 S.W.3d at 648. In her argument regarding her false light claim, Ms. McGuffey asserts that the statements at issue "would make it difficult for her to secure employment in her field." Although she presented evidence of her earnings after her termination from employment at BWS, she did not substantiate a loss of standing in the community, humiliation, or emotional distress.

*McGuffey*, 2020 WL 2754896, at *17-18 (footnote omitted).

As to the Trial Court's false light findings, Defendant argues that her statement concerning Ms. Austin's conviction for deadly conduct was true and its implications were true. Defendant contends that the Trial Court wrongly considered her motivation in publishing the statement in determining whether it cast Ms. Austin in a false light. She argues further that her statement about a gun having been used stemmed from a layperson's misunderstanding of the Texas statute. Defendant asserts that she did not act with reckless disregard as to the falsity of the publicized matter at issue. With respect to defamation, Defendant acknowledges having published a false statement about Ms. Austin but argues that she made a good faith effort to ascertain the truth. Defendant states further that Ms. Austin failed to show any damage to her reputation.

-14-

While Ms. Austin pled guilty to deadly conduct in Texas, Defendant's statements on Facebook omitted crucial context about her conviction. Namely, Ms. Austin pled guilty to deadly conduct to obtain a more favorable result for insurance purposes in her DUI case. While a DUI charge is a serious matter, Defendant's statements fundamentally distorted the truth about Ms. Austin's conviction in a manner highly offensive to a reasonable person. The import, or thrust, of Defendant's statements about deadly conduct and use of a gun was that Ms. Austin was violent or aggressive based on her conviction in Texas many years earlier. That is materially different from the truth, which is that Ms. Austin reached a plea deal in a DUI case and no gun was involved at all.

We are unpersuaded by Defendant's contention that she acted in good faith to ascertain the truth about Ms. Austin's conviction. We understand that Defendant is not a lawyer, and that the Texas statute is perhaps unfortunately named. Nevertheless, that Defendant is not a lawyer does not somehow shield her from a false light claim. Acting on minimal information, Defendant published statements about Ms. Austin that, while true so far as the reference to the deadly conduct statute goes, badly warped the reality of Ms. Austin's Texas arrest. In so doing, Defendant acted with reckless disregard. Insofar as Defendant argues that Ms. Austin failed to allege or prove damages, we note the ample evidence from trial concerning Ms. Austin's medical bills, personal humiliation, and mental anguish and suffering. We conclude that Ms. Austin adequately alleged and proved damages. The evidence does not preponderate against the Trial Court's findings relative to false light.

Regarding defamation, Defendant's false assertion that Ms. Austin's offense involved the use of a gun was defamatory as it held Ms. Austin up to public hatred, contempt, or ridicule. While obviously there is nothing defamatory per se about the use of a gun, "deadly conduct with use of gun" changes the picture completely. That introduces an element of disgrace as there is broad societal hostility to gun crime. Defendant charged ahead and made her false statement about Ms. Austin on a slapdash and flimsy basis. Defendant acted with a reckless disregard for the truth, and Ms. Austin consequently incurred medical bills, personal humiliation, and emotional distress. *See Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 164 (Tenn. Ct. App. 1997) ("The issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering."). The evidence does not preponderate against the Trial Court's factual findings relative to defamation.

Defendant argues overall that finding her conduct tortious would have a chilling effect on speech, and that courts would have to patrol the internet. We disagree. This case involves the application of well-established Tennessee law on defamation and false light. That Defendant's tortious remarks about Ms. Austin were put on the internet as opposed to

-15-

a bulletin board in a city square, for example, is not a defense. The same elements apply. We affirm the Trial Court in its finding Defendant liable for defamation and false light invasion of privacy.

We next address whether the Trial Court erred in awarding punitive damages against Defendant, including by failing to hold a separate proceeding pursuant to Tenn. Code Ann. § 29-39-104(a)(2)[4] or clearly setting out sufficient reasoning to support punitive damages pursuant to Tenn. Code Ann. § 29-39-104(a)(4).[5] This Court has discussed punitive damages as follows:

> To be entitled to punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant "acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). To meet the clear and convincing evidence standard, evidence must "leave[ ] 'no serious or substantial doubt about the correctness of the conclusions drawn.' " *Goff v. Elmo Greer &*

---

[4] Tenn. Code Ann. § 29-39-104(a)(2) (West eff. July 1, 2013) provides:

In an action in which the claimant seeks an award of punitive damages, the trier of fact in a bifurcated proceeding shall first determine whether compensatory damages are to be awarded and in what amount and by special verdict whether each defendant's conduct was malicious, intentional, fraudulent or reckless and whether subdivision (a)(7) applies[.]

[5] Tenn. Code Ann. § 29-39-104(a)(4) (West eff. July 1, 2013) provides:

In all cases involving an award of punitive damages, the trier of fact, in determining the amount of punitive damages, shall consider, to the extent relevant, the following: the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing; the impact of the defendant's conduct on the plaintiff; the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; the expense plaintiff has borne in attempts to recover the losses; whether the defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior; whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act; whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages. The trier of fact shall be instructed that the primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others while the purpose of compensatory damages is to make the plaintiff whole[.]

-16-

*Sons Constr. Co., Inc.*, 297 S.W.3d 175, 187 (Tenn. 2009) (quoting *Hodges*, 833 S.W.2d at 901 n.3). Punitive damages are intended to punish and deter similar future wrongs and "are available in 'cases involving only the most egregious of wrongs.' " *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 849 (Tenn. 2010) (quoting *Hodges*, 833 S.W.2d at 901).

*McGuffey*, 2020 WL 2754896, at *19.

Defendant argues that the punitive damages award must be reversed because the Trial Court failed to bifurcate the proceedings as required by Tennessee law. Notably, Defendant did not request bifurcation in the Trial Court. Even still, we recognize a 2020 opinion by this Court in which we determined that bifurcation in punitive damage proceedings is mandatory pursuant to Tenn. Code Ann. § 29-39-104(a)(2), even in bench trials and whether requested or not. We stated:

> Despite the lack of caselaw addressing the issue, several authors have opined that bifurcation is now mandatory pursuant to the statute. *See, e.g.*, Gary A. Cooper, *Tennessee Handbook Series, Tennessee Forms for Trial Practice – Damages* § 2:1 (2019) ("The *Hodges* decision provided that if a defendant moved for bifurcation, trial involving a claim for punitive damages would be bifurcated. The Tennessee Civil Justice Act of 2011 requires bifurcation of compensatory and punitive damages, without mention of any requirement that a defendant must move for such bifurcation."); *Id.* at § 2:2 ("Effective October 1, 2011, a motion for bifurcation of trial involving a claim for punitive damages is no longer required. The Act provides for bifurcation, without mention of the necessity of a motion."); Robert E. Burch, *Tennessee Handbook Series, Trial Handbook for Tennessee Lawyers* § 33:7 (2019) ("A trial in which punitive damages are sought shall be a bifurcated proceeding. . . ."); 8 *Tennessee Practice Series Pattern Jury Instructions Civil* 14.55A (2019 ed.) ("The statute requires bifurcation in Tenn. Code Ann. § 29-39-104(a)(2).").

> ***

> Returning to the language of the statute, it unequivocally states, "In an action in which the claimant seeks an award of punitive damages, *the trier of fact* in a bifurcated proceeding *shall* first determine whether compensatory damages are to be awarded and in what amount and by special verdict whether each defendant's conduct was malicious, intentional, fraudulent or reckless. . . ." Tenn. Code Ann. § 29-39-104(a)(2) (emphasis added). We conclude that this language is mandatory and that it applies to both jury trials

-17-

and bench trials. Courts "presume that the General Assembly used every word deliberately and that each word has a specific meaning and purpose." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010). Based on the plain language of the statute, we decline the invitation to read the statute as mandating bifurcation only in a jury trial and not in a bench trial.

\*\*\*

Because of the host of problems with the procedure employed and the lack of necessary findings, we deem it appropriate to vacate the award of punitive damages entirely. On remand, the proceedings should be conducted in two phases. First, the trial court should enter a revised order regarding its initial decision to *impose* punitive damages based on the evidence already presented at trial, clarifying whether it finds *by clear and convincing evidence* that Defendant acted intentionally, fraudulently, maliciously, or recklessly. If it does, the court must hold an additional hearing regarding the *amount* of punitive damages to be awarded, if any. Any additional order awarding punitive damages must address the statutory factors listed in Tennessee Code Annotated section 29-39-104.

*Hudson, Holeyfield & Banks, G.P. v. MNR Hospitality, LLC*, No. W2019-00123-COA-R3-CV, 2020 WL 4577483, at \*10-11 (Tenn. Ct. App. Aug. 7, 2020), *no appl. perm. appeal filed* (emphases in original); *see also Hogue v. P&C Invs., Inc.*, No. M2021-01335-COA-R3-CV, 2022 WL 17175608 , at \*13 (Tenn. Ct. App. Nov. 23, 2022), *no appl. perm. appeal filed* ("In trials where punitive damages are sought, the proceedings must be bifurcated.").

For their part, Plaintiffs acknowledge the caselaw but argue that interpreting Tenn. Code Ann. § 29-39-104(a)(2) to require bifurcation even when no one requests it violates the separation of powers doctrine in that it unduly interferes with the judiciary's control of its own procedure. The State, in turn, filed a brief defending the constitutionality of Tenn. Code Ann. § 29-39-104(a)(2). However, we need not reach the constitutional question. Not all errors by trial courts rise to the level of reversible error. Rule 36 of the Tennessee Rules of Appellate Procedure provides that a final judgment "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Even granting that Defendant is correct and the Trial Court erred in failing to bifurcate, Defendant does not articulate how she was prejudiced. It is wholly unclear how the result of this bench trial would have been more favorable to Defendant had the Trial Court conducted a separate hearing for punitive damages. That being so, any error by the Trial Court in failing to bifurcate proceedings for punitive damages was harmless in that it

-18-

did not more probably than not affect the judgment or result in prejudice to the judicial process.

Next on this issue, Defendant argues that the Trial Court failed to sufficiently review the factors for an award of punitive damages under Tenn. Code Ann. § 29-39-104(a)(4). The Trial Court did not explicitly set out and discuss each factor. However, the statute provides for consideration of the listed factors "to the extent relevant." Tenn. Code Ann. § 29-39-104(a)(4) (West eff. July 1, 2013). Not every factor will prove relevant to every case. It is clear from the Trial Court's order what it found relevant based on the evidence, and that related to the evidence showing the maliciousness of Defendant's act. The Trial Court found that "Mrs. Austin has presented clear and convincing evidence of the malicious and reckless behavior of the Defendant in making the Facebook post." The Trial Court found further that "Mrs. Plese was aware of the emotional distress caused by the display of Mrs. Austin's mugshot at the HOA meeting in August of 2019," and that "without confirming the accuracy of a statement, she chose on June 1, 2020 to post to Facebook that Mrs. Austin had been convicted of Dangerous Conduct <u>with a gun</u> even though the report she received indicated a conviction of Dangerous Conduct with an unidentified weapon." These findings, which the evidence does not preponderate against, fit with certain of the statute's factors, such as "the nature and reprehensibility of the defendant's wrongdoing; the impact of the defendant's conduct on the plaintiff; the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm[.]" Tenn. Code Ann. § 29-39-104(a)(4) (West eff. July 1, 2013). We find that the Trial Court adequately considered the factors for an award of punitive damages under Tenn. Code Ann. § 29-39-104(a)(4).

Lastly, Defendant argues that her conduct "did not rise to the level of reckless conduct as is required under the statute to permit the trial court to award punitive damages." The Trial Court found clear and convincing evidence "of the malicious and reckless behavior of the Defendant in making the Facebook post." The Trial Court found further that Defendant was aware of how upset Ms. Austin was at having her mugshot shown at the homeowner's association meeting. Defendant's actions toward Ms. Austin, her erstwhile neighbor, showed maliciousness. In addition, Defendant declined to timely retract her statements, only offering to do so a year later. Like the Trial Court, we find that Defendant's conduct was sufficiently egregious to support an award of punitive damages by the standard of clear and convincing evidence. We affirm the Trial Court's award to Ms. Austin of punitive damages.

We next address whether the Trial Court erred in its award of compensatory damages because Plaintiffs' damages were not caused by Defendant's defamation or false light. On this issue, Defendant argues that there was no causal connection between the

harm Ms. Austin suffered and the defamatory statements. As relevant to this issue, the Trial Court found:

> [T]he Court finds that Mrs. Austin's testimony about the impact of the defamatory statements to be credible. Her testimony was supported by the testimony of her husband and her treating doctor and photographs that were used to illustrate her life before the posting of statements by Mrs. Plese and her life after the posting. She testified that the actions of Mrs. Plese triggered events from Mrs. Austin's past. She testified that after the posting, she was embarrassed and withdrawn and did not want to participate in daily life. Her husband testified that when he would leave to go out of town for business, he constantly worried that his wife was in such a dark place that she might be tempted to take her own life. For a significant period of time, her doctor testified that she had difficulty managing stress, suffered insomnia, and suffered from moments of despair and hopelessness. Although the Austins are not seeking any economic damage from the sale of their house in Knoxville and their subsequent move to Florida, it was clear that the move was connected to Mrs. Austin's relationship with her neighbor and the impact on Mrs. Austin's well-being. The Court recognizes that Mrs. Austin had preexisting mental health issues requiring therapy visits, the visits increased, and the emotions were more intensified during a period of time after the Facebook posting. Dr. Rigell testified that she was "isolating, experiencing nightmares and dissociative experiences" based on the trauma caused by her neighbor.

There is no clear and convincing evidence that would serve to overturn the Trial Court's favorable assessment of Ms. Austin's credibility and her explanation of how Defendant's statements impacted her. Dr. Rigell's testimony further supports this causal connection. In short, Ms. Austin suffered personal humiliation, emotional distress, and incurred medical bills as a direct result of Defendant's tortious statements on Facebook. Defendant's attempt to argue that the actual cause was something other than the June 2020 Facebook posts is unavailing.

While there is evidentiary support for the Trial Court's findings with respect to medical bills, personal humiliation, and emotional distress, the same cannot be said for the Trial Court's $20,000 award to Ms. Austin for reputational damage. The record contains no evidence of reputational damage incurred by Ms. Austin. Plaintiffs argue that the evidence is circumstantial in nature. We disagree. The evidence shows that Ms. Austin suffered mentally and emotionally, became withdrawn, and required additional medical treatment, but none of the evidence goes toward her external standing in the community— her reputation. We therefore vacate that portion of the Trial Court's judgment granting

-20-

Ms. Austin $20,000 in reputational damage as there is simply no evidence in the record to support it.  We affirm the remainder of the compensatory damages.

The final issue we address is whether, regarding Mr. Austin, the Trial Court erred in awarding damages for loss of consortium, whether Defendant lacked sufficient notice of the claim prior to trial, and whether the Trial Court erred in amending the pleadings. Plaintiffs did not assert loss of consortium in their complaint, but the Trial Court found that the pleadings should be amended to conform to the evidence and include a loss of consortium claim.  Defendant states that she lacked sufficient notice of the claim.  In response, Plaintiffs say that the claim was tried by implied consent.  With respect to implied consent, this Court has stated:

> Tennessee Rule of Civil Procedure 15.02 creates an exception to the general rule that "[j]udgments awarded beyond the scope of the pleadings are void." *See Randolph v. Meduri*, 416 S.W.3d 378, 384 (Tenn. Ct. App. 2011) (footnote omitted).  Rule 15.02 provides in pertinent part:
>
> > Amendments to Conform to the Evidence.—When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.
>
> "Generally speaking, trial by implied consent will be found where the party opposed to the amendment knew or should reasonably have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby."  *Hiller v. Hailey*, 915 S.W.2d 800, 804 (Tenn. Ct. App. 1995) (quoting *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 890 (Tenn. 1980)).  As this Court has explained, "[t]rial by implied consent is not shown by the presentation of evidence that is relevant to an unestablished issue when that evidence is also relevant to the established issue."  *Christmas Lumber Co. v. Valiga*, 99 S.W.3d 585, 593 (Tenn. Ct. App. 2002) (quoting *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997)).  "The determination of whether there was implied consent rests in the discretion of the trial judge, whose determination can be reversed only upon a finding of abuse."  *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 891 (Tenn. 1980).

*Jones v. Unrefined Oil Co., Inc.*, No. E2023-00272-COA-R3-CV, 2024 WL 2797073, at *8 (Tenn. Ct. App. May 31, 2024), *no appl. perm. appeal filed*. Concerning the deferential abuse of discretion standard, our Supreme Court has stated that "[a]n abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). Our Supreme Court has explained that "the basis for recovery of loss of consortium is an 'interference with the continuance of a healthy and happy marital life and injury to the conjugal relation[.]'" *Yebuah v. Ctr. for Urological Treatment, PLC*, 624 S.W.3d 481, 489 (Tenn. 2021) (quoting *Tuggle v. Allright Parking Sys., Inc.*, 922 S.W.2d 105, 109 (Tenn. 1996)).

As relevant to this issue, the Trial Court found that "Mr. Austin testified at length about the significant impact of Mrs. Plese's defamatory Facebook post about his wife," and that "in discovery and in deposition he testified that an element of his damages was his consortium claim. He also testified at trial about the impact of his wife's depression and anxiety on his life, including his fear of leaving her alone because of her depression." Defendant argues on appeal that "a stressful, even painful, experience in a marriage is not sufficient to prove a loss of consortium claim," and further that "[Mr. Austin] did not testify or prove their communication, cooperation, or quality time suffered as a result of these events." We disagree with Defendant. Mr. Austin's testimony about the impact of Defendant's statements on his family life went squarely to the health and happiness of his marriage. It is evident from Mr. Austin's testimony that his marital life suffered as a result of Defendant's defamatory statements, including to the point where he feared Ms. Austin might engage in self-harm. Mr. Austin's testimony about the impact of Defendant's statements on his married life did not relate to the other established claims at trial, yet there was no objection. We conclude that Defendant was put on sufficient notice of Mr. Austin's loss of consortium claim. Further, the evidence does not preponderate against the Trial Court's findings regarding damages for Mr. Austin's loss of consortium. We find no abuse of discretion in the Trial Court's determination that Mr. Austin's loss of consortium claim was tried by implied consent and that the pleadings should be amended to conform to the evidence.

As a final point on damages, the parties agree that the Trial Court made a mathematical error in its order. The Trial Court awarded Ms. Austin $20,000 for reputation damage, $25,000 for emotional distress, and $5,100 for medical expenses; punitive damages totaling $25,000; and $20,000 for Mr. Austin's loss of consortium claim. The Trial Court stated total damages as $101,000. However, the damages instead add up to $95,100. Because we vacate the Trial Court's award of $20,000 to Ms. Austin for reputation damage, this leaves a total of $75,100. We therefore modify the judgment to $75,100.

In sum, we vacate that portion of the Trial Court's judgment awarding Ms. Austin $20,000 for reputational damage as it is unsupported by evidence. We modify the Trial Court's judgment to $75,100. Otherwise, we affirm.

## Conclusion

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed equally against the Appellant, Angela Kay Plese, and her surety, if any, and the Appellees, Ronald Austin and Linda Austin.

_____
D. MICHAEL SWINEY, CHIEF JUDGE